PHOTO ELECTRONICS
CORPORATION,
Plaintiff-Appellee,

v.

John M. ENGLAND, Trustee in Bankruptcy for Ferrex Corporation,
Defendant-Appellant.

PHOTO ELECTRONICS
CORPORATION,
Plaintiff-Appellee,

v.

FERREX CORPORATION,
Defendant-Appellant.

Nos. 77–2657, 76–1298.

United States Court of Appeals,
Ninth Circuit.

Sept. 8, 1978.

Albert E. Fey, William J. Gilbreth, David J. Lee, Fish & Neave, New York City; Max Thelen, Jr., Fredric C. Nelson, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for plaintiff-appellee.

Julian Caplan, Gregg, Hendricson, Caplan & Becker, San Francisco, Cal., Sidney Berlin, Berlin & Goodman, Redwood City, Cal., for defendant-appellant.

Before BROWNING and WRIGHT, Circuit Judges, and KUNZIG, Judge of the United States Court of Claims.

EUGENE A. WRIGHT, Circuit Judge:

Photo Electronics Corporation sued the Ferrex Corporation for infringement of Patents No. 3,351,707 ('707) and No. 3,471,-740 ('740). Ferrex countered that the patents in suit were obvious, obtained by fraud and not infringed. It counterclaimed that Photo Electronics' conduct in obtaining the patents and prosecuting the infringement action was violative of the antitrust laws. The district court held the patents valid and infringed, enjoined further infringement, ordered an accounting and dismissed the counterclaim.

Ferrex appealed the finding of liability pursuant to 28 U.S.C. § 1292(a)(4) while the accounting proceeded before a magistrate.

The district court reviewed and adopted the magistrate's findings and recommendations and awarded the plaintiff corporation damages of $2,934,800. Again, Ferrex appealed.

We consolidated the appeals, which are not prosecuted by England, Ferrex's trustee in bankruptcy.[1] We affirm the judgment of the district court.

The patents in suit comprehend an electronic video analyzer for color film negatives. The analyzer is designed to be a relatively inexpensive and maintenance-free device which reports information about the color content of film negatives of still photographs. Its principal use is in color laboratories that process film for professional photographers. The '707 patent claims the basic analyzer and the '740 patent claims a component of the system which automatically adjusts the brightness and contrast of the analyzer's video display.

Photo Electronics alleged that its patents were infringed by the Ferrex Colorverter 1000, and amended its complaint to allege that a later model of the Ferrex machine, the Colorverter 1500, also infringed its patents. The Colorverter 1000 was commercially unsuccessful and its production was extremely limited. The model 1500, however, was manufactured in considerable quantity and its sales were substantial.

I.

VALIDITY OF THE PATENTS

A. *General Principles.*

Patentability requires novelty, utility and nonobviousness. *Graham v. John Deere Co.,* 383 U.S. 1, 12, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); 35 U.S.C. §§ 101–103. Central to the resolution of this dispute is the question whether Photo Electronics' patents '707 and '740 are obvious in light of the prior art.

Patent validity is ultimately a question of law, but resolution of the obviousness issue turns on specific factual inquiries:

---

1. For clarity and convenience we will refer to the appellant throughout this opinion as "Ferrex."

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.

*Graham,* 383 U.S. at 17, 86 S.Ct. at 694. *See also Austin v. Marco Dental Products,* 560 F.2d 966, 971 (9th Cir. 1977), *cert. denied,* 435 U.S. 1477, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978).

"The trial court's Graham findings are binding on appeal if not clearly erroneous." *Saf-Gard Products, Inc. v. Service Products, Inc.,* 532 F.2d 1266, 1272 (9th Cir.), *cert. denied,* 429 U.S. 896, 97 S.Ct. 258, 50 L.Ed.2d 179 (1976).

Patents may be issued properly for inventions which combine elements existing in the prior art if the result is "unusual or surprising." *Great A & P Tea Co. v. Super Market Equipment Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950). *See also Saf-Gard,* 532 F.2d at 1272. Such combination patents, however, are critically appraised:

> Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. . . . A patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men. . . .

*Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976) (quoting *Great A & P Tea Co.,* 340 U.S. at 152, 71 S.Ct. 127). *See also Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc.,* 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); *Austin,* 560 F.2d at 972; *Kamei-Autokomfort v. Eurasian Automotive Products,* 553 F.2d 603, 608 (9th Cir. 1977).

Secondary considerations may be weighed to assist the court in determining whether a patent is obvious. Such factors as commercial success, long felt but unsolved need, and failure of others are relevant and appropriate to the inquiry. *Graham,* 383 U.S. at 17–18, 86 S.Ct. 684; *Austin,* 560 F.2d at 971; *Reeves Instrument Corp. v. Beckman Instruments, Inc.,* 444 F.2d 263, 271–72 (9th Cir.), *cert. denied,* 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971). Although the presence or absence of secondary factors is not conclusive, their presence buttresses a conclusion of nonobviousness. *Austin,* 560 F.2d at 972.

These "subtests" of patent validity are "more susceptible of judicial treatment than are the highly technical facts often present in patent litigation." *Santa Fe-Pomeroy, Inc. v. P & Z Co., Inc.,* 569 F.2d 1084, 1098 (9th Cir. 1978) (*citing Reiner v. I. Leon Co.,* 285 F.2d 501, 503–04 (2d Cir. 1960)). Resort to these factors is particularly helpful in deciding close questions of obviousness and assists the court in observing the caveat that "an invention will not be denied a patent because it embodies a solution which seems simple and obvious with the benefit of hindsight." *Santa Fe-Pomeroy, Inc.,* 569 F.2d at 1098; *Saf-Gard,* 532 F.2d at 1272.

Patents are accorded a statutory presumption of validity which can be overcome only by clear and convincing evidence. *Santa Fe-Pomeroy, Inc.,* 569 F.2d at 1091. The presumption, however, is dissipated when the patent examiner is shown to have failed to consider pertinent prior art. *Saf-Gard,* 532 F.2d at 1270–71.

Finally, the patent applicant's duty to fully and fairly disclose all facts affecting patentability is relevant to the issues raised in this appeal. Patents create legal monopolies, and a patent applicant's failure to disclose pertinent information impairs the Patent Office in its function of preventing issuance of unlawful patent monopolies. *Precision Instruments Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 818, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Maurice A. Garbell, Inc. v. Boeing Co.,* 546 F.2d 297, 300 (9th Cir. 1976); *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.,* 407 F.2d 288, 296 (9th Cir. 1969). Breach of this duty is relevant to the issue of patent validity. *Monolith Portland Midwest,* 407 F.2d at 294.

## B. *Construction of the Patent Claims.*

Because a patent's claims are the "sole measure of the monopoly granted," *Burgess & Associates v. Klingensmith*, 9th Cir. 1973, 487 F.2d 321 at 324, the construction given them is critical in patent litigation.

Construction of the claims is influenced by the general rule that patentees are a favored class of litigants, *Santa Fe-Pomeroy*, 569 F.2d at 1091 (*quoting Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 335, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)). The starting point is the rule that patent claims should be construed liberally to uphold the patent's validity rather than to destroy the inventor's right to protect the substance of his invention. *Technitrol, Inc. v. Control Data Corp.*, 550 F.2d 992, 998 (4th Cir.), *cert. denied*, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 79 (1977); *Roberts Dairy Corp. v. United States*, 530 F.2d 1342, 1367, 208 Ct.Cl. 830 (1976); *Cool-Fin Electronics Corp. v. International Electronic Research Corp.*, 491 F.2d 660, 661 (9th Cir. 1974). *See generally* 4 Deller's Walker on Patents § 226 (2d ed. 1965).

■ The policy favoring liberal construction of patent claims, however, goes only so far. Patent validity may not be founded on functions or characteristics not mentioned in the patent claims. *Burgess*, 487 F.2d at 324. A patentee cannot defend his patent's validity on the basis of functions or characteristics not apparent at the time the patent issued or discoveries that later altered his understanding of his invention's scope. *Standard Coil Products Co. v. General Electronic Co.*, 306 F.2d 319, 322–23 (2d Cir. 1962).

■ Interpreting patent claims calls for more than application of a rigid literalism. The patent is a contract between the government and the patentee. The accepted rules for construing contracts should be consulted and applied. " '[A]ll parts of the writing, and every word in it, will, if possible, be given effect,' so in construing a patent, the entire instrument, including the drawings and specifications, should be considered." 4 Deller's Walker on Patents § 225 at 67 (2d ed. 1965) (footnote omitted). *See United States v. Adams*, 383 U.S. 39, 48–49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

Mindful of these principles of patent construction and validity, we proceed to review the district court's decision.

## C. *Standard of Review.*

As discussed above, the legal issue of patent validity is closely tied to the trial court's factual inquiries, and the court's *Graham* findings will not be upset unless they are shown to be clearly erroneous. *Austin*, 560 F.2d at 971.[2] Ferrex contends, however, that because the district court adopted Photo Electronics' proposed findings of fact substantially verbatim, the clearly erroneous standard is not properly applicable here.

The district court's findings of fact appear to be an exhaustive review and resolution of the highly technical documentary and testimonial evidence, entered after lengthy reflection.[3] The record reveals, however, that the court did adopt the plaintiff's proposed factual findings with only minor modifications. Ferrex contends that the court "mechanically adopted" the plaintiff's proposals without independently assessing the evidence. It argues that the findings should be accorded less weight than usual on appeal.

■ Wholesale adoption of the prevailing party's proposed findings complicates the problems of appellate review. *See United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656–57 & n.4, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), *cited in United States for the Use and Benefit of Union Bldg. Materials Corp. v. Haas and Haynie Corp.*, 577 F.2d 568, 575 (9th Cir. 1978) (Renfrew, J., dissenting).

---

**2.** "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United*

*States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

**3.** Testimony concluded on November 8, 1972, and findings were entered on March 29, 1975.

■ Although the practice has been disapproved, we have indicated that it may be permissible in cases "involving highly technical issues such as may be involved in patent cases and complex scientific problems." *Industrial Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1339–40 (9th Cir. 1970).

■ Certainly, the fact that the trial judge has adopted proposed findings does not, by itself, warrant reversal.[4] But it does raise the possibility that there was insufficient independent evaluation of the evidence and may cause the losing party to believe that his position has not been given the consideration it deserves. These concerns have caused us to call for more careful scrutiny of adopted findings. *Ceco Corp. v. Bliss & Laughlin Industries, Inc.*, 557 F.2d 687, 689 (9th Cir. 1977); *Burgess & Associates, Inc. v. Klingensmith*, 487 F.2d 321, 324–25 (9th Cir. 1973).

■ Although we do scrutinize adopted findings by conducting a painstaking review of the lower court proceedings and the evidence, we do not abandon the clearly erroneous standard. We will overturn factual findings if the record firmly convinces us that a mistake has been made. *See supra* n.2. Such a standard assures litigants that errors will be corrected after review. A court reviewing findings drafted by a litigant merely has a more burdensome task.[5]

### D. The '707 Patent.

#### 1. Relevant Technical Background.[6]

The '707 patent utilizes a field sequential color television system.[7] Field sequential systems relay information for three colors in succession through one amplified video circuit. Color is added externally by filters rotating rapidly in synchronization with the information displayed. The viewer's eye integrates the red, green and blue displays and perceives a single, full color picture.

Home color television receivers utilize the "RCA system" in which three separate video amplifiers simultaneously relay red, green and blue information to three electron guns inside the single display tube. Each gun activates appropriately colored phosphor dots on the tube's screen, and the phosphors glow, presenting a full color picture.

A third color television system, like the RCA, uses three amplified video circuits. However, the red, green and blue images are displayed separately on three black and white screens. A stationary filter of the appropriate color is mounted in front of each screen. Beam-splitting mirrors superimpose the pictures, creating a single color picture.

Beginning in the 1950's, the Technicolor Corporation utilized this third type of sys-

---

4. "[Such] findings leave much to be desired in light of the function of the trial court. . . . But they are nonetheless the findings of the District Court. And they must stand or fall depending on whether they are supported by evidence." *United States v. Crescent Amusement Co.*, 323 U.S. 173, 184–85, 65 S.Ct. 254, 260, 89 L.Ed. 160 (1944). (Citation omitted.)

5. In this case the record reveals that although the trial court adopted the findings proffered by Photo Electronics, there was far more than merely a "mechanical adoption." In his post-judgment order modifying the findings, the trial judge stated:

Never before has a case been under submission before me such a long time; for never before have I been confronted with such highly technical, scientific evidence as is found in the record of the instant case. It necessitated extraordinarily painstaking and time-consuming study on my part at such times as the demands of my other work permitted. . . . My restudy of the record and the briefs has only served to reinforce in all other respects my initial decision filed earlier.

6. The following brief summary is drawn from the district court's Findings of Fact 6–16. A careful review of the record reveals that these findings are not clearly erroneous.

7. Field sequential color television was first developed by the Columbia Broadcasting System. Descriptions of the CBS color television system were contained in articles published in the proceedings of the Institute of Radio Engineers in 1942 and 1943. These articles were cited to the Patent Office as pertinent prior art in the application for patent '707.

tem in a video negative analyzer.[8] Technicolor used its system in analyzing motion picture film negatives. It was large, expensive and complex, requiring constant calibration, and therefore of practical use only in photographic development projects warranting the time and expense its operation entailed.

The Technicolor system's use of three video channels enabled it to matrix the colors presented in the television picture and thereby to approximate closely the picture which could be reproduced in a positive photographic image. *See infra* n.12.

The Hazeltine Research Corporation also developed a video system for use in motion picture development.[9] It, too, used three video channels and matrixing, but its video display employed an RCA picture tube. Hazeltine's analyzer, like Technicolor's, was complex and unstable. It was never successfully adapted for use in developing still photographs.

In addition, there were early attempts to adapt field sequential systems for use in color film processing. Typical of these is the Biedermann patent, No. 2,295,628. Biedermann, however, did not use separate field sequential scanner (FSS) and display tubes. Instead, it utilized a "negative feedback" system whereby the information received from the scans and the color filtration was fed back to the scanning tube, which doubled as the system's display element. Mirrors reflected the image through color filters to be viewed by the operator. The technique was simple and inexpensive, but the system as a whole did not manifest the stability required for consistent performance. Neither did this device include color adjustment features. It merely rendered a positive reproduction of the photographic image.

### 2. *Dreyfoos' and Mergens' Work.*

The co-inventors, Alex W. Dreyfoos and George W. Mergens, are former employees of Technicolor-New York, a subsidiary of Technicolor Corporation. Technicolor, based in California, processes color film for the motion picture industry. Technicolor-New York, at the time Dreyfoos and Mergens worked there, processed photographic prints for the amateur photography market.

Technicolor developed and used the sophisticated system described above in its motion picture business, and it considered developing a less complex system for use in processing amateur color still photographs. The task was assigned to a Dr. Schrieber who attempted to perfect a practical application of field sequential television techniques for that purpose. Dreyfoos, who was in charge of quality control at Technicolor-New York, learned of the project, offered several suggestions and once, while on the West Coast, observed Schrieber's work. Schrieber left Technicolor without finishing the project, and the company eventually abandoned the project as a failure.[10]

Dreyfoos and Mergens later joined to form Photo Electronics and ultimately developed the field sequential color negative

---

**8.** The Technicolor system is embodied in two patents, Evans, No. 2,863,938; and Dixon, No. 2,961,483. Both were considered by the district court. The Evans patent was cited to the Patent Office by the inventors.

**9.** Hazeltine's device is described in Bailey patents Nos. 2,976,348 and 3,002,048; both of which were considered at trial.

**10.** Whether the Technicolor-Schrieber device was indeed abandoned as a failure was a point of contention below. The record reveals that Technicolor stopped pursuing the project when it concluded after years of work that the device was not an aid to developing color photographs. Moreover, there is no evidence that a patent for the machine was sought or that it was ever reduced to practice. The district court's finding that the effort was an abandoned experiment is not, therefore, clearly erroneous despite the contrary inferences Ferrex would have us draw from the evidence.

Ferrex argues that the Schrieber experiment was not put into operation merely because it was too slow for use in developing amateur photographs, where speed is essential, and that the patentees only found a market in which the Schrieber machine could be profitably utilized. The evidence discloses that Technicolor ceased work on the project because the machine was not an aid to color film developing and that the patented device differs markedly from Schrieber's work.

analyzer which is the subject of this dispute. They assigned the patent to their company and contracted with Eastman Kodak Corporation to market the invention.

The patented device is designed for use, not in processing amateur color films, but by color film labs that process high-quality prints for professional photographers. Photo Electronics' device has gained wide acceptance by such labs and has enabled them to streamline production while improving the quality of the prints they produce.

### 3. Features of the '707 Patent.

The '707 patent, titled "Electronic Color Viewer," describes a "field sequential" closed circuit color television system designed to produce positive color images of photographic negatives on a viewing screen. The operator may adjust the image for overall brightness, color, balance and intensity. When a satisfactory television image is obtained, the color and brightness adjustment data are recorded for use in developing a positive color print.

The object of the system is to eliminate substantial guesswork in gauging film development criteria by utilizing the electronic viewing technique and, as a result to produce an acceptable color print the first time. Thus, the use of "test prints" and the accompanying labor and materials expense is significantly reduced.

The patent employs a flying spot scanner cathode ray tube (FSS) which emits a light beam. The beam falls on a color negative and travels through a series of lenses which focuses it on a light-sensitive photomultiplier tube (PMT). The PMT generates signals which are amplified and transmitted to a second cathode ray tube which presents a positive image of the photographic subject.

The color television technique employed is "field sequential" because the FSS scans the negative in distinct sequences, each of which relays information about one of the colors recorded in the dyes of the photographic negative: red, blue and green. The scan transmits red color information when a red filter is interposed between the negative and the PMT. In a similar fashion, filters are interposed in sequence to relay the blue and green information through the PMT to the display tube.

These scanning filters are mounted on a drum which rotates in synchronization with other elements in the system. The shaft on which the drum rotates is shared with a second series of red, blue and green filters which surrounds the video display tube.[11] The display tube itself is much like a black-and-white home television screen. The filters surrounding it rotate so that, at the instant red picture information is being transmitted through the red scanning filter and the PMT to the screen, a red filter is positioned between the display and the viewer's eye.[12] The filters rotate very rapidly in time with successive color scans and the viewer's eye integrates the images.

The intensity of each color in the positive video display is adjustable through control elements which enable the operator to vary the PMT's dynodes' voltage color by color. A fourth control regulates the overall brightness of the display. In addition to the system adjustments resulting from the

---

11. Also mounted on the shaft is a timing disk. The disk rotates with the filter drums and, through an arrangement of timing tracks and circuitry, synchronizes the functioning of the FSS, the display tube, and a PMT reference light.

12. A significant feature of the invention is the use of color filters of different characteristics at the scanning and display ends of the system. The scan filters receive and transmit the information recorded in the negative's dyes. A color television system, however, is capable of producing color pictures more pure than can be reproduced on photographic paper. Therefore, to create on the video display an image that accurately represents a photographic print, the display filters are selected to allow some degrading of the colors in the television picture.

This feature allows Photo Electronics to use successfully a field sequential system in its color negative analyzer and departs from the prior art which relied on "matrixing" to accomplish the desired matching of the video display with the color reproducing capabilities of photographic paper. This point, as well as Ferrex's contention that the use of different sets of filters is not claimed properly in the patent, will be discussed further infra.

operator's picture-by-picture color balancing, the '707 patent includes a number of closed loop feedback circuits which monitor the performance of critical components and automatically make adjustments to assure constant performance.

A photocell located near the negative senses changes in the FSS beam and adjusts the voltage supplied to the FSS when the beam's intensity varies. This loop stabilizes the amount of light falling on the negative notwithstanding the beam's tendency to fade as the FSS ages. It also assures the beam's constancy throughout operation of the analyzer's "zoom" function during which the distance between the FSS and the negative varies.

Another feedback circuit monitors the consistency of the PMT's response for each color scan. During the instant following the completion of each color scan when the FSS emits no light, a beam from a reference light of constant intensity is directed on the PMT through a filter the color of the next FSS scan. This beam of constant intensity should produce a constant PMT response for each color, although the output may vary from color to color. If the response to the reference light pulse varies, adjustments to the PMT's dynode voltage are made to correct it.

A third loop monitors brightness of the cathode ray display tube. This loop is the subject of the second patent, '740, and is described in further detail *infra*. The loop, like that monitoring the FSS, utilizes a photocell which detects changes in the tube's brightness and triggers corrective adjustments. As display tube brightness is adjusted, compensating changes are made to keep the display's contrast constant.

At the outset of this litigation Photo Electronics advised Ferrex that it would rely on claims 2, 9, 11, 20, 28 and 29 as typical of the claims infringed by Ferrex's device.[13]

### 4. The Disposition Below and Ferrex's Objections.

#### a. The Graham Findings.

Ferrex contends that the district court misapprehended the state of the prior art, considered features outside the patent claims in comparing it to that art, failed to make other essential findings, and committed other reversible error. We disagree.

The evidence treated the teachings of the prior art and the findings adopted by the court considered those references in detail. Having accepted Ferrex's invitation to scrutinize the documentary evidence, we have considered the testimony before the court, but we decline to reweigh it *de novo*. The findings are not clearly erroneous.

Furthermore, we cannot agree that the court erroneously construed the claims when it compared them to the prior art.[14]

---

**13.** Claim 2 describes the analyzer's basic system, including the FSS (an unmodulated scanner, *i. e.*, one without negative feedback), a field sequential video channel, mechanically connected color filters of differing characteristics and a rotating timing disk.

Claim 9 incorporates several preceding claims and describes the system controlling the PMT dynodes' voltage for each color. Claim 11 further describes this system with its reference lamp and the interposition of color filters corresponding to the color next to be scanned.

Claim 20 incorporates claim 12 and describes the feedback loop that maintains constant illumination at the negative during the zoom function. Claim 12 describes the zoom feature which enables the analyzer to scan negatives of varying sizes or to focus on a small area within a negative by moving the FSS and the negative support platform in relation to a fixed objective lens. The method employed substantially eliminates focusing adjustments.

Claim 28 comprehends all the features in the system and claim 29 adds the video display tube feedback circuit.

**14.** The crux of Ferrex's objection in this regard is the judge's consideration of Plaintiff's Exhibit 97. That exhibit described the patent's claimed features as illuminated by the specifications, other evidence, and the patent's inventive concept. The construction given the claims in the exhibit then was proper, as was the construction given them in the disposition below.

Ferrex would have us read the claims in the abstract, an approach which is contrary to fundamental principles of patent law. *See generally* 4 Deller's Walker on Patents §§ 228, 231, 244, 264. *See also United States v. Adams*, 383 U.S. at 49, 86 S.Ct. at 713 ("it is fundamental

In construing patent claims, consultation of the patent specifications is entirely proper. *E. g., United States v. Adams*, 383 U.S. at 48, 86 S.Ct. 708. In a complex case such as this, it is essential to an informed inquiry and decision. *Graham* requires that the claims be compared to the prior art, but the court's first task is to ascertain the meaning of those claims. That, in essence, is what the court did and was the correct approach to the legal question of patent construction.

Ferrex argues that the district court erred in failing to assess the level of ordinary skill in the pertinent art. Although there is no express finding on the point, it is abundantly clear that the court considered the relevant evidence. Moreover, the court's appreciation of the level of skill in the art is apparent from the disposition. As we recently stated,

> [f]actual findings on the level of ordinary skill in the pertinent art "can be made only by an analysis of the problem allegedly solved by the invention and the efforts of others to arrive at a satisfactory solution."

*Santa Fe-Pomeroy*, 569 F.2d at 1097 (*quoting Reeves Instrument Corp.*, 444 F.2d at 270). *See also Graham*, 383 U.S. at 17–18, 86 S.Ct. 684; *Austin*, 560 F.2d at 971. Viewed in this light, the inquiry and the findings are sufficient under *Graham*.

Ferrex also argues that the absence of findings describing unusual or surprising results is fatal to the holding of patent validity. Assuming that this is purely a combination, triggering the requirement for such a finding, *Great A & P Tea Co.*, 340 U.S. at 152, 71 S.Ct. 127, the court's disposition was adequate, if not explicit, on the point. The conclusion that the '707 patent produced such results fairly leaps from the text of the disposition and is buttressed substantially by the lower court's consideration of secondary factors of nonobviousness.

In sum, this aspect of Ferrex's assault on the patent amounted to citing isolated characteristics from each of many prior art references it placed before the court. There are no references which show that the district court's *Graham* findings are clearly erroneous and, taken together, the references present at best a patchwork of somewhat related projects and patents which contain some of the same components found in the '707 patent.[15]

### b. *Secondary Considerations.*

■ The findings consider in some detail the secondary factors of nonobviousness described in *Graham*, 383 U.S. at 17–18, 86 S.Ct. 684. Ferrex contends that these criteria were given undue weight. We think that a case such as this one, where the evidence is extremely technical and complex, is precisely the type of dispute where resort to the secondary considerations can assist the trial judge in his efforts to resolve the question of obviousness.

There was a long-felt but unsolved need for such a device. Color labs that processed film for professional photographers desired a tool that would eliminate much of the trial and error in achieving acceptable still color prints. Devices which preceded this invention, such as the Technicolor and Hazeltine analyzers, were too complex, costly and temperamental for such work.

Dreyfoos and Mergens successfully adapted existing color television technology and other principles of electronics to create a field sequential color negative analyzer with exceptionally stable characteristics. Its single-channel design reduced expense, size and complexity, making the analyzer attractive to professional color film laboratories. There is little doubt that Dreyfoos

that claims are to be construed in the light of the specifications and that both are to be read with a view to ascertaining the invention").

15. The district court considered and distinguished as not pertinent all the prior art references proffered by Ferrex. The bases for the court's conclusions are found in large part in the testimony of Ferrex's expert witnesses.

It would serve little purpose for us to discuss in detail the multitude of references considered at trial. Having reviewed the record, we are clear that the judge's conclusions regarding the prior art are not clearly erroneous. The statutory presumption of patent validity remained in force and was not overcome by clear and convincing proof.

and Mergens succeeded where others had failed.

Photo Electronics has enjoyed great commercial success. Eastman Kodak moved quickly to secure distribution rights. Major color laboratories purchased substantial numbers of the analyzer and industry associations have acclaimed it. The analyzer has been successfully adapted for use with motion picture film. Retail sales have exceeded $12 million.

#### c. Other Issues.

■ Ferrex contends that Dreyfoos and Mergens secured the patent through fraud on the patent office and that Schrieber was the true inventor of the video analyzer. Evidence supporting those contentions is insubstantial, and we think that the trial judge correctly concluded they were without merit.

[9] The appellant further contends that the court impermissibly relied on a comparison of plaintiff's and defendant's commercial structures in reaching the conclusion of patent validity. It is clear, however, that the inquiry at trial was extensive and correctly focused.

■ Finally, the court properly considered Ferrex's copying of Photo Electronics' machine as evidence of non-obviousness. *Neff Instrument Corp. v. Cohu Electronics, Inc.*, 298 F.2d 82, 87 n. 11 (9th Cir. 1961) ("use of an invention by another who has been trying to develop a similar product is evidence of the validity of a patent").

#### 5. Conclusion.

■ The district court correctly held the representative claims of the '707 patent valid.

### E. The '740 Patent.

#### 1. Features of the '740 Patent.

■ The '740 patent claims the feedback circuit which monitors performance of the analyzer's display tube and makes adjust-

ments to maintain constant contrast and brightness of the video display. Claims 1 and 7 of the patent, which were designated by Photo Electronics as typical, describe the loop which senses picture tube brightness by means of a photocell and makes adjustments to the voltage on a grid within the tube.[16] As brightness is adjusted, automatic adjustments to contrast are made by inversely varying the voltage to a second grid.

#### 2. The Prior Art.

Ferrex proffered one prior art reference in its challenge to patent '740. That reference, Sam's Photofact, a system used in home television receivers, regulates contrast and brightness with adjustments applied to the cathode (the picture tube's electron gun) and to one grid. The prior art does not comprehend adjusting contrast and brightness simultaneously through opposite voltage adjustments to two grids.

#### 3. Conclusion.

The district court considered conflicting testimony regarding the obviousness of the patent in light of Sam's Photofact and the level of skill in the prior art. Again, much of Ferrex's argument turns on its charge that the patent's claims were misconstrued. However, as was the case with the '707 patent, the court properly considered the patent specifications and other evidence in reaching its construction.

There were indications in the testimony of Ferrex's experts that the prior art was devoid of any teaching of this manner of controlling brightness and contrast of a video display. The court concluded that the patent was non-obvious and we affirm that conclusion.

### III.

### INFRINGEMENT

■ Many of the infringement issues were resolved by stipulation and, because

---

16. Changes in the display can be detected by visual observation as well, and a single manual adjustment may be made to alter brightness and contrast.

we have held that the patents are valid, the stipulation is conclusive.[17]

Ferrex, however, reserved several infringement issues for trial. Those issues pertained to the Colorverter's method for timing the vertical and horizontal sweep circuits in its FSS and display tubes, its use of timing tracks and electronic pickups on the timing disk, its utilization of a differential amplifier in conjunction with a gating device to store voltages for regulating the PMT's response to the different color scans, and its use of a timing track for controlling the gating device to "open" only during the short blanking period between scans.

Based in part on the deposition of the Ferrex Colorverter's designer and the testimony of another Ferrex expert, the court found that the Colorverter's vertical sweep circuits are timed from the disk and therefore infringe claim 2 of patent '707.

The court further concluded that Ferrex's use of the timing disk to generate timing pulses to synchronize the functions within its analyzer infringed claims 9, 11, 12 and 20 of the '707 patent. Although the Ferrex machine may time several functions from a single pulse from the disk and the Photo Electronics machine utilizes distinct pulses for each function, the difference is minor and the claims are infringed. This finding, too, was based in part on the testimony of one of Ferrex's experts. In addition, there was substantial evidence from which the judge could conclude that the operational amplifier used by Ferrex is indeed a species of differential amplifier and that its use with the gating device further infringed the '707 patents claims 9 and 11.

Finally, the court found that the Ferrex feedback circuit for its video display tube

adjusted contrast and brightness through opposing voltage changes to the two grids within the tube. Although Ferrex changed the circuit in 1971 from automatic contrast control to a separate adjustment, the manner of adjustment remained identical to that in Photo Electronics' '740 patent.

In summary, the evidence demonstrates that the court's findings on the infringement issue are not clearly erroneous and that its conclusion that various claims of the patents in suit were infringed was proper.

## IV.

## THE ANTITRUST COUNTERCLAIM

The district court dismissed the counterclaim because it found Ferrex's allegations totally unsupported in the evidence. We agree. The patents are valid and Ferrex has infringed their claims. There is no substantial evidence from which the court could conclude that the patentees misled the Patent Office in order to obtain the patent or that it since has abused it in restraint of trade.

## V.

## DAMAGES

Ferrex contends that the accounting should have been stayed pending appeal of the liability determination, that "equities" in the case require a reduction of the award, that plaintiff's patent misuse precludes a judgment for plaintiffs and that "reasonable royalty damages" were computed improperly. These arguments are meritless and do not require extensive discussion.[18]

17. Counsel agreed that if the patents were valid the Ferrex Colorverter infringed claims 28 and 29 of the '707 patent. The parties further agreed that, with several issues reserved for trial, the Colorverter infringed claims 2, 8, 9, 11, 12 and 20 of the '707 patent.

18. Because the accounting is now complete and the infringement issues have been resolved, Ferrex's complaint that the accounting should have been stayed is moot.

Ferrex argues that damages in patent cases should be computed conservatively. *Faulkner v. Gibbs*, 199 F.2d 635, 639–40 (9th Cir. 1952). This is not to say, however, that properly computed compensatory damages should be reduced when a defendant asserts he is unable to pay. *Cf. Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977). Moreover, the magistrate and the district judge considered and rejected Ferrex's assertion that the supersedeas bond requirement was oppressive.

■ Ferrex also contends that lost profits was an improper measure of damages for the infringement and that erroneous accounting methods were employed to fix the amount. The provision governing damages for infringement, 35 U.S.C. § 284, provides in pertinent part:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

The 1946 amendment to § 284 changed the measure of damages from the infringer's profits to the patent holder's lost profits. *See Aro Manufacturing Co. v. Convertible Top Co.*, 377 U.S. 476, 505, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) (dictum) ("[i]n patent nomenclature what the infringer makes is 'profits'; what the owner of the patent loses by such infringement is 'damages' "). The *Aro* dictum explains further that the 1946 amendment's purpose was "precisely to eliminate the recovery of profits as such and allow recovery of damages only." 377 U.S. at 505, 84 S.Ct. at 1542.

The amount awardable for infringement is, therefore:

"compensation for the pecuniary loss he [the patentee] has suffered from the infringement, *without regard to the question whether the defendant has gained or lost by his unlawful acts*". . . . They have been said to constitute "the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred."

*Aro*, 377 U.S. at 507, 84 S.Ct. at 1543 (citations omitted) (emphasis added).

During the accounting Ferrex attempted to show that Photo Electronics utilized the patent in an illegal tying arrangement. The court held that the issue should have been raised in support of the antitrust counterclaim and that it was too late to raise it at the accounting. We agree. Furthermore, we agree with the district court's alternative conclusion that the allegation was without substance.

This court expressly followed *Aro* in *Atlas–Pacific Engineering Co. v. Geo. W. Ashlock Co.*, 339 F.2d 288, 290 (9th Cir. 1964) (reversing award of reasonable royalty damages). The *Atlas Pacific* court also followed the Fifth Circuit's decision in *Livesay Window Co. v. Livesay Industries*, 251 F.2d 469 (5th Cir. 1958), which held that lost profit damages are proper "[i]f in all reasonable probability the Patent Owner would have made the sales which the Infringer has made." *Id.* at 471.

Photo Electronics showed convincingly that with the exception of one late-entering, *de minimis* competitor, Ferrex was the only other manufacturer of video negative analyzers during the period in question and that color film labs needed such equipment to remain competitive in the industry.

Moreover, the differences between plaintiff's product and that of the defendant (price, compatability with other equipment and functional adaptability) were too insubstantial to rebut the considerable evidence that those who purchased the Ferrex machine would have at some time purchased Photo Electronics' product, but for the infringement.[19]

Computation of the amount of damages was based on testimony, including that of an independent accountant, that was credited by the magistrate and the district judge.

We conclude that the measure of damages was legally proper and that the amount of damages awarded was not clearly erroneous.

## VI.

## CONCLUSION

The judgment is affirmed.

Finally, our resolution of the propriety of awarding lost profit damages in this case renders it unnecessary for us to address the objections to the reasonable royalty computation.

19. In this phase of the litigation, too, the plaintiff's proposed findings of fact were adopted. Both the magistrate and the district court accepted them. Accordingly, they have been carefully scrutinized. *See* discussion at part I.B. *supra*.