**Gerald Joseph CAPLAN, Petitioner-Appellant,**

v.

**Thomas R. VOKES,[1] in his capacity as United States Marshal, and Alexander M. Haig, United States Secretary of State, Respondents-Appellees.**

No. 79–2662.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 1980.

Decided July 6, 1981.

---

1. The substitution of Thomas R. Vokes and Alexander M. Haig as successors in office, re- spectively, to Louis Villaescusa and Cyrus R. Vance, is effected by Fed.R.App.P. 43(c).

George W. Buehler, Los Angeles, Cal., for petitioner-appellant.

Robert A. Pallemon, Asst. U. S. Atty., Los Angeles, Cal., for respondents-appellees.

Before NELSON and BOOCHEVER, Circuit Judges, and WILLIAMS,* District Judge.

NELSON, Circuit Judge:

Gerald Joseph Caplan appeals from a district court order denying habeas corpus relief in an international extradition proceeding. The United Kingdom seeks Caplan's extradition on 60 charges accusing Caplan and others of theft, forgery, and false accounting in the management of a collapsed London financial firm. In the original extradition proceeding, the district judge, sitting as a committing magistrate under 18 U.S.C. § 3184,[2] certified Caplan as extraditable on all but the first of these charges. Caplan's petition for habeas corpus came to be heard before, and was de-

* Honorable Spencer Williams, United States District Judge, Northern District of California, sitting by designation.

2. "Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction with having committed within the jurisdiction of any such foreign government any of the

nied by, the same district judge that had conducted the extradition proceeding. We have jurisdiction of this appeal under 28 U.S.C. § 2253. For the reasons set forth below, we remand.

## FACTS [3]

From February 14, 1968, to December 4, 1973, Caplan was the Chairman and Managing Director of what eventually became the London and County Securities Group, Ltd. ("L & C"). L & C was formed as a holding company for a finance company, London & County [Advance & Discount], Ltd. ("A & D"), in which Caplan had held a controlling interest since 1961. L & C acquired the entire interest in A & D in 1969.

In January, 1969, L & C became a public company, with shares first trading on the London Stock Exchange in May, 1969, at £ 0.25 per share. By May, 1972, the share price had risen to a peak of £ 4.00 per share. A more or less steady decline in price followed, tracking the downturn in the British economy.

In order to counteract the decline in share prices, Caplan arranged for A & D, through an intricate group of transactions in the names of nominee owners, to buy and hold L & C shares. This practice is labelled "warehousing" in the Government's case, and it is in relation to warehousing transactions that most of the charges against Caplan arise. The warehousing plan did not succeed in stabilizing the share price, and,

with the company in disarray, trading in L & C was ultimately suspended on November 30, 1973, at £ 0.45 per share.

On December 4, 1973, Caplan resigned; a caretaker board of directors took over the following month. On January 11, 1974, on request of the board of directors, the British Department of Trade & Industry appointed inspectors to investigate the affairs of L & C. The investigation included an extensive examination of Caplan, who cooperated with the inspectors.

In November, 1974, after his final session with the Department of Trade & Industry, Caplan and his wife moved to France and applied for permanent resident status. A year later, in November, 1975, the two moved to Monaco where Caplan took part in a business venture. Caplan was forced to resign his Monaco position in January, 1976, in the wake of the public report issued by the Department of Trade & Industry criticizing Caplan's management of L & C; the two then moved to their present residence in Beverly Hills, California.

Caplan was arrested in April, 1978, pursuant to the provisional arrest provisions of the extradition treaty,[4] on complaint by the U.S. Attorney on behalf of the government of Great Britain. The Bow Street Magistrate's warrant, dated May 18, 1978, was filed in the district court on June 7, 1978; this warrant set forth the 60 charges on which extradition was sought. Following a hearing held on December 12, 1978, the district court issued a memorandum opinion

crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain that charge under the provisions of the treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue

his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made." 18 U.S.C. § 3184.

**3.** The facts have been taken from various documents filed in the extradition court, but have not been authoritatively "found."

**4.** *Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland*, art. VIII, 28 U.S.T. 229, TIAS 8468 (1976) [hereinafter "*Extradition Treaty*"].

on February 23, 1979, stating that charges 2 through 60 were extraditable, but reserving certification on the charges pending preparation of findings "adequate to support a determination of 'probable cause'[5] as to each element" of the charged offenses. Proposed findings were submitted by the government on March 22, 1979. On July 31, 1979, the district court adopted the findings and certified Caplan as extraditable on Charges 2 through 60.

In August, 1979, Caplan petitioned for a writ of habeas corpus, asserting various challenges to the certification of extraditability. After a hearing in September, 1979, the petition was denied in October, 1979. From that denial this appeal was taken.

## ARGUMENTS

 Because a certification of extraditability is not a "final order," no direct appeal lies from that decision. Review is therefore available only by way of petition for habeas corpus. *Collins v. Miller*, 252 U.S. 364, 369, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920). Our inquiry in reviewing the denial of such a petition, in turn, is more restricted than that afforded in a direct appeal. Thus, as most recently stated in this Circuit:

> The scope of review of an extradition order is considerably more restricted than that generally engaged in by an appellate court. On collateral review by habeas corpus, the Court is not permitted to inquire beyond whether (1) the extradition judge had jurisdiction to conduct extradition proceedings; (2) the extradition court had jurisdiction over the fugitive; (3) the treaty of extradition was in full force and effect; (4) the crime fell within

the terms of the treaty; and (5) there was competent legal evidence to support a finding of extraditability. *See Fernandez v. Phillips*, 268 U.S. 311, 312 [45 S.Ct. 541, 542, 69 L.Ed. 970] (1925).

*Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir.), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978). Recognizing this constraint, Caplan has directed his arguments largely at the fourth category above. He thus argues, first, that extradition on Charges 2 through 21 is barred by the statute of limitations, and second, that the facts found under Charges 22 through 60 do not establish extraditable offenses. We shall examine each contention.

### I. *Charges 2 through 21.*

Under our treaty with the United Kingdom, Caplan cannot be extradited on any charge for which "prosecution . . . has become barred by lapse of time according to the law of the requesting or requested Party."[6] The relevant statute of limitations appears in 18 U.S.C. § 3282, which bars most non-capital prosecutions where charges have not been brought within five years. *See Jhirad v. Ferrandina*, 486 F.2d 442, 444 (2d Cir. 1973). Measuring from the date of the London arrest warrant, May 18, 1978, we are concerned under this inquiry with charges involving acts prior to May 18, 1973.

Charge 2 involves a fictitious bank account maintained between February, 1968, and December, 1973, straddling the limitations period. Charges 3 through 21 allege acts taking place no later than April, 1973. Caplan cannot be extradited on the pre-May-1973 offenses unless the statute of limitations was tolled. The applicable tolling provision, 18 U.S.C. § 3290, provides

---

**5.** "(1) Extradition shall be granted only if the evidence be found sufficient according to the law of the requested Party . . . to justify the committal for trial of the person sought if the offense of which he is accused had been committed in the territory of the requested Party . . . ."

*Extradition Treaty, supra* note 4, art. IX, § 1. *See Benson v. McMahon*, 127 U.S. 457, 462–63, 8 S.Ct. 1240, 1242–43, 32 L.Ed. 234 (1888); *Sindona v. Grant*, 619 F.2d 167, 175 (2d Cir. 1980); *Greci v. Birknes*, 527 F.2d 956, 958 (1st Cir. 1976).

**6.** *Extradition Treaty, supra* note 4, art. V, § 1(b).

that "no statute of limitation shall extend to any person fleeing from justice." In *United States v. Wazney*, 529 F.2d 1287, 1289 (9th Cir. 1976), we stated:

> [I]n order to establish that an accused was "fleeing from justice" within the meaning of section 3290, the prosecution must meet the burden of proving that the accused concealed himself with the intent to avoid arrest or prosecution. The statute of limitations is made inapplicable whenever an accused flees from justice because the failure to prosecute is attributable to the unacceptable conduct of the accused. The accused should not be responsible, however, for unintentional delays, such, for example, as one caused by an open move to a new residence where the accused is readily accessible to careful law enforcement officers.

The government advances two reasons for its contention that Caplan intended to evade arrest by moving from England. First, it argues, because the British Department of Trade and Industry conducted an investigation of the affairs of L & C—including an extensive examination of Caplan—Caplan had a clear understanding that criminal charges might ensue. The inference that Caplan left because of the possibility of criminal charges stemming from the investigation, however, is negated by the facts. Caplan was first questioned by the Department in June, 1974. He listed his house for sale in early July, 1974. Thereafter, he delayed his departure from England for several months to allow the investigation to be completed. It is also clear that Caplan had been planning to leave England for several months prior to his departure. In fact, Caplan and his wife applied for non-residence classification with the British government several months be-

fore departure. In preparing the application, they gave the government the address to which they planned to and did in fact move. In France, Caplan conducted business under his true name. When Caplan was forced to resign from his business in Monaco, he moved to this country where he at all times used his true name and address. Finally, the evidence showed that Caplan returned to England in February, 1975, for a one-week period and in 1977 for a stop-over during an international flight. During this entire period, Caplan never had notice that he was wanted for arrest or that criminal charges were contemplated. These facts belie the government's contention that Caplan left to avoid prosecution. Certainly Caplan did not cause any delay by "unacceptable conduct."

The government also contends that we should find the requisite intent because by moving to France, Caplan made his arrest more difficult. Acceptance of this argument, however, would mark a return to the "mere absence" standard which the *Wazney* court rejected. His departure from England may have necessitated extradition proceedings, but it did not cause the British government's lengthy delay in initiating prosecution. The government had obtained whatever information it needed from Caplan before his departure. As Caplan notes, adoption of the government's argument would mean that for the duration of the applicable statute of limitations "there was no burden of diligence on the Government and that Caplan simply could not leave England in any manner or under any circumstances."[7]

The government failed to meet its burden of proving that Caplan concealed himself with intent to avoid arrest or prose-

---

7. The limitations provision of the treaty, no less than any found in domestic law, represents an important right of the accused. As the Supreme Court has stated, statutes of limitation "provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." *United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971). Criminal statutes of limitations are therefore liberally interpreted in favor of repose. *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970).

cution. Consequently, the district court's finding that Caplan was a "fugitive from justice," thus tolling the statute of limitations under 18 U.S.C. § 3290, was clearly erroneous. Caplan cannot, consistent with the limitations provision in the Extradition Treaty, be extradited on charges 3 through 21, nor on charge 2 to the extent it alleges a violation that did not continue beyond May 18, 1973.[8]

## II. Charges 22 through 60.

In the remaining charges, numbered 22 through 60, Caplan is accused of violating several provisions of the British Theft Act.[9] The majority of the charges flow from the practice referred to by the government as "warehousing," involving L & C share purchases in the names of nominee holders and subsequent transfers of funds to cover the costs of the purchases. Other charges concern allegedly improper director loans and allegedly false accounting entries.

Our review of the extradition proceeding in light of the arguments on appeal has uncovered serious shortcomings. Caplan argues that the facts "found"[10] by the extradition court do not establish the criminal violations charged.[11] The government seems to argue that so long as offenses can be found in United States law that correspond to those charged in the warrant, extradition should be granted without reference to whether the charged offenses constitute crimes in the requesting country. These arguments have focused our attention on the nature of the charges and the requirements they must meet under the treaty in order for extradition to be granted.

The extradition court merely made a conclusory finding that charges 22 through 60 were sufficient to establish extraditable offenses. The following sentences contain the court's sole finding regarding whether the charged offenses themselves were eligible for extradition:

**8.** This is not to say that Caplan's extraditability on the latter part of charge 2 has been established. Rather, extraditability of this charge must be examined in light of treaty requirements in the same manner as we discuss below with respect to charges 22 through 60.

**9.** Theft Act, 1968, c. 60, §§ 1, 16, 17, 19. Charges 22 through 38 allege theft in violation of section 1 of the Act; charges 39 through 48 and 51 through 54 allege "dishonestly obtaining a pecuniary advantage" in violation of section 16 of the Act; Charges, 49, 50, and 55 through 59 allege false accounting in violation of section 17 of the Act; and charge 60 alleges the publication of a misleading, false, or deceptive statement of account with intent to deceive in violation of section 19 of the Act.

**10.** The "Findings of Fact" entered in the extradition court do not constitute true findings of fact in the sense that the court has weighed the evidence and resolved disputed factual issues. See Heiniger v. City of Phoenix, 625 F.2d 842, 843 (9th Cir. 1980). The "findings" are based almost entirely on affidavits, depositions, and other documentary evidence supplied by the requesting government, see 18 U.S.C. § 3190 ("[d]epositions, warrants, or other papers or copies thereof . . . shall be received and admitted as evidence"); Collins v. Loisel, 259 U.S. 309, 317, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922) ("unsworn statements of absent witnesses may be acted upon by the committing magistrate"), in a proceeding where the accused has no abso-

lute right to introduce exculpatory evidence and the government has no duty to do so, see Charlton v. Kelly, 229 U.S. 447, 456, 33 S.Ct. 945, 947, 57 L.Ed. 1274 (1913). The committing court's function is merely to determine whether there is "any evidence warranting the finding that there was a reasonable ground to believe the accused guilty." Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925). Thus, in a manner somewhat analogous to "findings of fact" in connection with the grant of summary judgment, see Heiniger v. City of Phoenix, supra, 625 F.2d at 843–44, the findings of the extradition court serve only the narrow function of indicating those items of submitted evidence on which the decision to certify extraditability is based.

**11.** This case thus differs from Cucuzzella v. Keliikoa, 638 F.2d 105 (9th Cir. 1981). In Cucuzzella, no question arose as to whether the charged conduct was criminal in Canada, the requesting country; rather, the petitioner argued that no comparable offense in the United States—under either federal law or state law—satisfied the treaty requirement of punishability by imprisonment for more than one year. We rejected that argument and pointed to several offenses that met the requirement. Id. at 107–08. Here, by contrast, Caplan has by no means conceded that the charged conduct is criminal in any jurisdiction.

The sixty charges contained in the London arrest warrant are ones enumerated within the Schedule associated with Article III of the extradition treaty appearing at 28 United States Treaties as being of an extraditable nature.... The charges contained in the London arrest warrant are offenses which are also considered unlawful in this jurisdiction and would subject an offender to a possible sentence in excess of one-year imprisonment.

■ Two concepts require that an explicit finding be made regarding the extraditability of each charge. First, under the "principle of dual criminality," no offense is extraditable unless it is criminal in both jurisdictions. *See Collins v. Loisel*, 259 U.S. 309, 312, 42 S.Ct. 469, 470, 66 L.Ed. 956 (1922); *Wright v. Henkel*, 190 U.S. 40, 58–63, 23 S.Ct. 781, 785–87, 47 L.Ed. 948 (1903). *Compare Brauch v. Raiche*, 618 F.2d 843, 847–51 (1st Cir. 1980) *with Shapiro v. Ferrandina*, 478 F.2d 894, 905–09 (2d Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). This particular treaty expressly incorporates the dual criminality requirement and, moreover, specifies that the offense must be punishable by imprisonment for more than one year in each country and that it must be a felony under United States law.[12] Second, the "principle of specialty" limits prosecution in the requesting country to those extraditable offenses established by the facts on which extradition has been granted by the asylum country. This principle is also expressly incorporated in the treaty.[13] Under this principle, the inquiry does not end merely because the accused is found extraditable on one charge. A determination must be made as to whether each specific charge forms the basis for extradition, as the defendant may be prosecuted only on extraditable charges.

■ The district court's conclusory finding that extraditable offenses had been alleged in Charges 22 through 60 is insufficient especially where, as here, there is doubt regarding the government's legal theory that the alleged conduct is criminal. In a persuasively reasoned opinion, the Second Circuit has held that the principle of specialty mandates a careful culling of extraditable offenses from non-extraditable offenses. *Shapiro v. Ferrandina, supra*, 478 F.2d at 905–09. This Circuit has acknowledged the same requirement. *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981).

No such culling is evident here. Nothing in the record shows with any specificity that Caplan's alleged acts constitute crimes in England, nor that they constitute corresponding offenses in this country under the dual criminality requirement.

■ Had a more complete examination of these charges and their satisfaction of treaty requirements been made in the extradition court, we could review the determinations of extraditability as questions of law. The record in this case simply does

---

12. "(1) Extradition shall be granted for an act or omission the facts of which disclose an offense within any of the descriptions listed in the Schedule annexed to this treaty, which is an integral part of the Treaty, or any other offense, if:
 (a) the offense is punishable under the laws of both Parties by imprisonment or other form of detention for more than one year or by the death penalty;
 (b) the offense is extraditable under the relevant law, being the law of the United Kingdom or other territory to which this Treaty applies by virtue of sub-paragraph (1)(a) of Article II; and
 (c) the offense constitutes a felony under the law of the United States of America."

*Extradition Treaty, supra* note 4, art. III, § 1.

13. "(1) A person extradited shall not be detained or proceeded against in the territory of the requesting Party for any offense other than an extraditable offense established by the facts in respect of which his extradition is granted, or on account of any other matters, nor be extradited by that party to a third State—
 (a) until after he has returned to the territory of the requested Party; or
 (b) until the expiration of thirty days after he has been free to return to the territory of the requested Party."

*Extradition Treaty, supra* note 4, art. XII, § 1.

not permit such review, however, because it contains nothing from which we can discern the extradition court's reasoning as to extraditability. We have before us a group of broad charges, a conclusory finding that all 60 of them satisfy the treaty, and voluminous "Findings of Fact"[14] that purportedly supply cause to believe Caplan committed the offenses charged. The record is devoid of coherent legal connections between the factual allegations and *extraditable* offenses.

We cannot furnish those connections here. Arguments and findings relating to whether each charge satisfies the treaty requirements are part of the record that should be developed in the extradition court in the first instance, where the full adversary participation of counsel permits extensive inquiry into such questions.[15] For us to attempt to cure such a substantial deficiency at this stage of the proceedings represents an inefficient and, in the absence of more active participation of counsel, error-prone application of the time and energy of an appellate court.

In our view, an adequate extradition proceeding must include in its record a specific delineation, as to each charge, of the legal theories under the requesting country's law by which the accused's conduct is alleged to constitute an extraditable offense, together with an identification of the corresponding offenses in this country relied on to show that the "dual criminality" requirement has been met.[16] Because this proceeding lacks such a record, we are constrained to grant relief to Caplan. This is not to say, however, that a certification of extraditability on charges 22 through 60 should not eventually be made.[17] We merely hold that a more complete examination of each charge must take place in connection with such a certification.

## CONCLUSION

Caplan cannot be extradited on charge 1, charges 3 through 21, nor that part of charge 2 alleging a violation that did not continue past May 18, 1973. Caplan's extraditability on the latter part of charge 2, as well as on the remaining charges, has not

---

**14.** The findings of fact, forming the bulk of a 175-page document, were drafted by counsel for the government and adopted verbatim by the extradition court. Thus we must scrutinize them with greater than usual care. *See Heiniger v. City of Phoenix, supra* note 8, 625 F.2d at 844 n.4; *Photo Electronics Corp. v. England,* 581 F.2d 772, 776–77 (9th Cir. 1978); *Industrial Building Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336, 1339–40 (9th Cir. 1970). This seems especially appropriate where, as here, the adopted findings are unnecessarily lengthy, complex, and confusing. The instant case is not the sort of highly technical or scientific matter, such as a patent dispute, which escapes this Court's disfavor toward wholesale adoption of findings prepared by the prevailing party. *Compare Photo Electronics Corp., supra,* 581 F.2d at 776 (patent) *with Hagans v. Andrus,* 651 F.2d 622 (9th Cir. 1981) (sex discrimination). The findings in this proceeding are replete with detail but unilluminating as to its meaning. The purposes such findings serve in the extradition context would be better served by clear and concise findings that reflect the actual thinking of the committing judge.

**15.** *See, e. g., Matter of Sindona,* 450 F.Supp. 672, 680–84 (S.D.N.Y.1978) (detailed examination of Italian law), *petition for habeas corpus denied sub nom. Sindona v. Grant,* 619 F.2d 167 (2d Cir. 1980).

**16.** In reviewing extradition charges in light of the dual criminality requirement, the district judge or magistrate should "look to proscription by similar provisions of federal law or, if none, the law of the place where the fugitive is found or, if none, the law of the preponderance of states." *Cucuzzella, supra,* 638 F.2d at 107.

**17.** The so-called "window dressing" charges, numbered 55 through 59, have been called somewhat into question in this court. The government has conceded in its brief the charges 56 and 58 are not, after all, extraditable in light of the treaty's dual criminality requirement. Caplan's counsel, meanwhile, stated at oral argument that at the trial in England of Caplan's co-defendants, the judge had directed verdicts of acquittal on similar charges on the ground that "window dressing" was a common practice among English banks. These developments may bear on any subsequent certification of Caplan's extraditability.

been sufficiently established. We therefore remand this case to the district court with instructions to discharge the petitioner unless, within a reasonable time not to exceed 90 days, a judge or magistrate certifies his extraditability under 18 U.S.C. § 3184 in conformity with this opinion.[18]

---

**18.** This somewhat cumbersome method of remand is needed because, owing to the collateral nature of habeas corpus review in an extradition proceeding, we have no direct power to vacate or modify the extradition court's certification. *See Shapiro v. Ferrandina, supra*, 478 F.2d at 914.