[Civil No. 2767.  Filed April 23, 1929.]

[276 Pac. 523.]

R. L. GRAY, Appellant, v. A. R. HEADLEY, Appellee.

See Appeal and Error, 4 C. J., sec. 2855, p. 884, n. 37.
Customs and Usages, 17 C. J., sec. 60, p. 497, n. 98, sec. 77, p. 508, n. 46.
Replevin, 34 Cyc., p. 1508, n. 61.

Mr. John A. Ellis (Mr. Clarence N. Boord, of counsel), for Appellant.

Mr. Luther P. Spalding, and Messrs. O'Sullivan & Morgan, for Appellee.

McALISTER, J.—This is an action in replevin involving the ownership and right to possession of 539 head of Angora goats. The plaintiff, A. R. Headley, sought to recover them, or their value in case delivery could not be made, and damages for their wrongful taking and detention from R. L. Gray.

Following the taking of them by the sheriff under a writ of replevin the defendant gave a redelivery bond and retained possession, his answer claiming ownership in himself being filed a few days later. A trial before the court resulted in a judgment for plaintiff for $2,533.25, $1,800 of which was the value of the property and $733.25 damages. From this judgment and an order denying his motion for a new trial, the defendant has brought the case here for review.

It appears from the record that appellee for a valuable consideration purchased the goats from one Dee Simpson, who, with his wife, conveyed them to appellee by bill of sale dated October 25th, 1926, and delivered five days later. At that time the goats were in the possession of Simpson and whatever title he had passed to appellee, whose interest depends wholly upon Simpson's ownership and right to sell. Hence the real question before the trial court was the determination of the latter's interest in the goats when he sold them. According to the record, appellant, being the owner, turned them over to Simpson in July, 1924, to look after and run. They are not in accord, however, as to the nature of the agreement in the beginning, the understanding of Simpson being that he was purchasing the herd, and of appellant that he was running them on shares. It is immaterial, however, which one is correct since there is no question but that Simpson did take charge of, handle, graze, breed and care for them until the fall of 1926, and that in May of that year it was agreed between them that they would be run and the settlement made upon a lease basis, Simpson to receive one-half of the wool clip and one-half of the increase from the goats from July, 1924, to shearing time in the fall of 1926. It was also agreed that appellant would pay the expenses of running the outfit, including the wages of herders and supplies, and that he should be repaid these advances by Simpson.

It appears further that appellant did pay the expenses; that he kept an account of them; that the wool clipped prior to the fall of 1926 was sold by him and shipped in the name of Gray and Simpson; and that one-half of the proceeds thereof were applied to the payment of the expenses. Whether he was to be repaid solely from this source and whether the amount realized therefrom was sufficient for the purpose are both in dispute, appellant claiming that there was no such agreement and that a balance of $2,000 was still due him by Simpson, while the latter testified that the expenses were to be defrayed in this way and that this had been done, though he admitted a grocery bill was standing against him at Hillside.

In August, 1926, it was agreed between them that Simpson would no longer care for the goats and that they would divide the increase at shearing time. It appears from Simpson's testimony that pursuant to this the yearlings (kid crop of 1925) were rounded up at appellant's place on the 6th or 7th of September, 1926, divided into two bunches, and sheared separately, the wool from one bunch being turned over to him and that from the other to appellant. After shearing them Simpson drove them to his place six miles away the same day and put them in a corral by themselves. The 1926 kids were already there and before leaving appellant's place with the yearlings he promised Simpson to be over the following day to divide the increase of both years, but instead sent his son and a Mexican who was working for him. They accomplished the division by running them through a chute, cutting "one one way and one the other" until the entire increase were in two equal bunches. His half, 221 yearlings and 318 kids, were placed in a corral and immediately newly earmarked, while appellant's were driven to his place the same day by his son and his Mexican employee. Simpson

told appellant the following day that he had marked his (Simpson's goats) and appellant replied, "that is good," and in answer to a query of Simpson as to the number driven back to his place stated that he counted them and they "counted out." Following the division Simpson sheared those that had not been sheared at appellant's place and sold the wool himself along with that he had taken from the 221 yearlings. He remained at his place for some time caring for the goats set aside to him and on October 23, 1926, asked appellant, according to the latter's testimony, for a statement showing that one-half of the increase of goats for 1926 amounted to 318 head, his purpose being to raise money to pay the balance due on his expense account. Appellant objected at first, he testified, but finally gave him the following written statement, though he told him not to sell or mortgage the goats:

"Bridle Creek, October 23, 1926.
"This is to certify that I have divided the kid crop of this year, 1926, with Dee Simpson from goats he has had leased from me, his half being 318 head.
"R. L. GRAY."

A week later the bill of sale from Simpson and wife to appellee was delivered and a few days after its delivery appellant went to Simpson's place and took 200 head of the goats away and, according to his testimony, returned the week following and took 299 more, having in the meantime examined the account and ascertained that Simpson still owed him $1,600. Appellee informed him at the time that he had bought them from Simpson and appellant replied that Simpson owed him and he was going to take them, his position apparently being that Simpson had no title to any of the goats unless there were some of his one-half remaining after settling his account. The division of the increase, appellant testified, was for the purpose of shearing and not intended to vest in Simp-

son the ownership of the one-half he clipped. It was not disputed, however, that Simpson sold the wool from this clip himself and kept the proceeds, whereas appellant had disposed of the four previous clippings and applied the returns to the expense account.

The court found from these and other detailed facts along the same line, which it is not necessary to state here, that appellee was the owner of the goats in question, that their value was $1,800, that appellant had retained possession of them under his redelivery bond until the trial, and that appellee had sustained damages in the sum of $733.25 on account of the increase and the mohair clipped and sold during this period, and gave judgment for appellee in the total of these two items, he having elected to take the value of the property instead of the property itself.

There are only two errors assigned, the first and principal one being that the court erred in finding that the plaintiff was the owner of the goats in question because the evidence shows that they were the property of the defendant. He contends that it clearly appears from the entire evidence that the repayment of the expenses advanced by him for running the goats was a condition precedent to the passing of title to any of the goats to Simpson, it being plain that the latter's portion of the wool clipped was wholly insufficient for this purpose, and therefore impossible that he could have understood that title to any of the goats would be in him until this expense had been cared for. Whether it was agreed that the expenses should be taken care of out of the mohair, or whether it was intended that the increase be divided in September, 1926, and each party given title to his one-half, or merely that they be separated for convenience in shearing, are matters on which the evidence is directly in conflict. It is clear, however, that the evidence is ample to support the contention of appellee that it was intended to vest title in him,

and this court will not therefore disturb the judgment upon this ground. It has been stated by us so often that a judgment will stand where the evidence upon which it is based is conflicting and that in its support is sufficient to uphold it that it is unnecessary to cite authorities on the proposition.

The second assignment grows out of the refusal of the court to admit testimony as to the custom relative to the leasing of goats, it being contended that such custom became a part of the contract. This contention is clearly without merit. There was an express agreement between the parties in August, 1926, providing that the goats should be treated as having been run on a leasing basis and that both the increase from 1924 to the fall of 1926 and the mohair to be clipped in the autumn of 1926 should be divided equally between appellant and Simpson at the fall shearing. This understanding, in the mind of the trial court, was sufficiently clear to render immaterial any evidence as to the meaning customarily attached to the term "one-half of the increase" and it occurs to us that this is correct. It is only where there is uncertainty or ambiguity in the agreement that evidence of usage may be received to show intention. 17 C. J. 497.

The judgment is affirmed.

LOCKWOOD, C. J., and ROSS, J., concur.