226 P.2d 1016

GLAD TIDINGS CHURCH OF AMERICA
v. HINKLEY.

No. 5182.

Supreme Court of Arizona.

Jan. 29, 1951.

308

Fennemore, Craig, Allen & Bledsoe, of Phoenix, for appellant.

Gust, Rosenfeld, Divelbess, Robinette & Linton, of Phoenix, for appellee.

DE CONCINI, Justice.

Suit was commenced by Hermina Hinkley to quiet title to lot 12, block 10, City of Phoenix, against defendant Glad Tidings Church, hereinafter referred to as the Church. The Church answered and counterclaimed asking for specific performance of a contract to purchase real estate. From a judgment in favor of Mrs. Hinkley by the trial court sitting without a jury, the Church presents this appeal.

The facts giving rise to the controversy in this case are these. Phil R. Hinkley and Hermina Hinkley, husband and wife, owned as joint tenants certain property situated on the northeast corner of East Adams Street and Second Street in Phoenix, Arizona. On December 29, 1938 the Hinkleys entered into a contract with the Pentecostal Holiness Church, a corporation which later changed its name to Glad Tidings Church of America, for the sale of this property to the Church.

The contract provided for a purchase price of $20,000, payable $10 cash at the

time of executing the contract, monthly payments of $45 which were to include 2½% interest per annum on the unpaid balance of the purchase price, and that the entire balance was to be paid in cash on January 1, 1940. Time was declared of the essence and the Church went into immediate possession under the contract. The contract also provided to escrow the papers with the Arizona Title Guarantee and Trust Company which was never done.

The contract was recorded on December 30, 1938 and on the day the contract was executed, the Hinkleys executed a warranty deed in favor of the Church and the Church executed a quitclaim deed in favor of the Hinkleys and these documents were left in the latter's possession. After the contract took effect Mr. Hinkley died late in 1939 and Mrs. Hinkley took the property by sole survivorship.

About June 4, 1940 the Church having failed to pay the balance of the purchase price on January 1, 1940 as provided in the contract, but having continued to pay, and Mrs. Hinkley having continued to receive, the monthly payments of $45, Mrs. Hinkley sent a "Notice of Cancellation" to the Church which was acknowledged on June 7 by Mr. John T. Sharrit, who occupied the dual position of secretary-treasurer and trustee of the Church and also of agent for the Hinkleys on income tax matters. The text and acknowledgement of the notice is as follows:

"You Are Hereby Notified: That by reason of your default in the payment of the balance purchase price of $19,990.00 on January 1, 1940 under your contract for the purchase of Lot 12, Block 10, Phoenix, Maricopa County, Arizona, as provided in agreement of sale dated December 29, 1938, and by reason of default in the performance of the other terms and conditions of said contract, the said contract and all your rights thereunder are hereby terminated.

"Dated this 4th day of June, A.D. 1940.
\* \* \* \* \* \*

"I Hereby Acknowledge Receipt of the orignial of the above Notice of Cancellation this 7 day of June, A.D. 1940.

"Pentecostal Holiness Church,
 "(a corporation)
"By: /s/ John T. Sharrit
 "John T. Sharrit, Secretary."

After service of this notice, the Church remained in possession and continued to pay and Mrs. Hinkley continued to receive $45 per month until October 1946.

On May 31, 1945 Mrs. Hinkley had her attorney draw up and present to the Church a proposed new contract for the purchase and sale of the property in question at the same price and terms as in the initial contract but which extended the final payment until 1960, and further conditioned that the premises were to be used by the Church for twenty years and that the then pastor, Dr. Sutton, and the secretary, Mr. Sharrit, were to remain active in connection with

the Church's affairs. The Church officials executed and delivered this document to Mrs. Hinkley, who never signed it. It was therefore never effective as a contract. Subsequent thereto the Church changed its trustees, pastor and a high percentage of its membership.

On October 1, 1946 Mrs. Hinkley sent to the Church a notice of termination of tenancy directing the vacating of the premises within 30 days. On October 21, 1946 the Church deposited the usual $45 payment to Mrs. Hinkley's bank account. After returning from a vacation trip, Mrs. Hinkley closed the account upon discovering this deposit and had her check for $45 made out and returned to the Church. The Church never cashed this check.

On November 4, 1946 the Church placed $20,000 on deposit with the Phoenix Title and Trust Company and a letter was sent Mrs. Hinkley asking her to deliver the deed and advise them of the correct amount due her under the contract. She refused to deliver the deed or to furnish the requested information. This deposit was withdrawn by the Church in October 1947, approximately a year later.

The Church assigns 2 errors of the lower court that may be summarized as follows: (1) Neither of the notices delivered to the Church was effective to accomplish a forfeiture of the contract since the plaintiff failed to give the required 10 day notice as provided in the contract or to tender a deed with them; (2) That the parties by their conduct have shown that there was a valid subsisting agreement between them throughout this period and the Church is therefore entitled to specific performance of the contract. Other facts will be related as they become necessary in deciding the questions presented herein.

The first question to be answered is in two parts (a) Was the notice of cancellation of June 4, 1940 effective without giving the 10 day grace period provided for in the contract? and (b) Was the same notice effective without a tender of deed by Mrs. Hinkley to show her willingness to perform? Unless otherwise specified the word "notice" will refer to the notice of cancellation of June 4, 1940.

The notice was given to take effect summarily upon receipt thereof on June 7, 1940. The contract provided that in order for the sellers to terminate the contract they would have to give the buyer 10 days notice; to quote the contract, "(the seller may) upon ten days notice * * * and a failure to correct such default within said 10-days period, declare this contract at an end, * * *" The buyer was in default in the payment of the purchase price six months before the notice was given. Under section 71–126, ACA 1939, a buyer purchasing real property under contract and in default has 30 days in which to bring his payments up to date if his equity is less than 20% of the purchase price. The commencement of the grace period dates back to the time of the default and not from the

date of termination of notice. Alger v. Brighter Days Mining Corporation, 63 Ariz. 135, 160 P.2d 346.

 We will now consider whether the notice of cancellation without providing the 10 day grace period was sufficient and effective. The notice of termination was intended to have a summary effect. But the law does not favor forfeitures and if a party would avail himself of a contractual provision providing for such a forfeiture, he must comply strictly with all the requirements of the contract. In this case Mrs. Hinkley's notice did not so comply and therefore the notice was ineffective for that purpose.

 As for the second part of the question, the Church relies on the rule laid down in the case of Boone v. Templeman, 158 Cal. 290, 110 P. 947, 950, that "* * * The vendor must tender a deed as a condition to demanding payment of the price, and he cannot, without such tender, declare a forfeiture, or maintain a suit either for the whole price, or for an intermediate installment." While there is some authority to the contrary, the above appears to be the general rule. However, we believe that an offer of tender is sufficient in a notice of forfeiture if there is an expression by the vendor in his notice of forfeiture that upon payment by the vendee, the vendor is ready, willing and able to tender and deliver a deed upon receipt of payment. We believe the general rule as modified by the conditional tender as above stated is the better

rule. However in this case no conditional tender was made.

 Mrs. Hinkley contends that no tender was necessary when it is shown that a tender would be an unavailing and a futile gesture because the Church did not have the money to pay for the property. The evidence does disclose that the Church could not pay the purchase price at the time of the notice and was not able to do so until it made its deposit on November 4, 1946, some six years later. In support of her position many cases are cited and this court has conformed to the general rule that law does not require one to do a useless thing in our recent case of Schmitt v. Sapp, 71 Ariz. 48, 223 P.2d 403. However the facts are somewhat different here for Mrs. Hinkley has failed to show that she was aware of the inability of the Church to perform and therefore she was not excused. In discussing this principle of excusing tender, it is stated in 49 Am.Jur., Specific Performance, sec. 144, p. 168: "The defendant must have openly and unconditionally refused to perform, or his conduct, voluntary or involuntary, must have amounted to anticipatory breach, in order to excuse tender on the part of the plaintiff. It is not enough that the plaintiff thinks, even though correctly, that the defendant will refuse or be unable to perform within the time stipulated."

 Granting that the notice of cancellation of June 4, 1940 was ineffective for both the reasons above stated, we are un-

able to say that such notice was totally ineffective for any purpose. While it is true that from the acceptance by Mrs. Hinkley of the $45 monthly payment from the date of default on January 1, 1940 to the date when the notice of cancellation was served, we can imply that Mrs. Hinkley waived time as of the essence of the contract at that time. Yet after the notice was served we cannot imply that she waived the continuing default unless her subsequent actions caused the Church to be lulled into a sense of security in their reliance upon the original contract.

As we have stated in Onekama Realty Co. v. Carothers, 59 Ariz. 416, 129 P.2d 918, 922, in discussing the equitable principle applicable generally to situations of this type:

"The case cited (Shaw v. Morrison, 145 Wash. 420, 260 P. 666) agrees with the general rule laid down by this court that a vendor who has accepted payments after they are due cannot thereafter insist upon strict performance of the contract unless and until he notifies the vendee of such intent and gives a reasonable time for the vendee to bring his payments up to date. But it does not discuss the question of whether after suit brought defendant must pay, or offer to pay, the delinquent installments as a part of his defense.

"The rule above stated is obviously based on the equitable principle that when one has lulled another into security by his conduct he cannot take advantage of such conduct until he has given an opportunity to the deceived party to restore the status quo. But the correlative of this rule, based on the familiar maxim that he who seeks equity must do equity, requires that when the vendee acquires knowledge of the intent of the vendor to insist on strict performance, *no matter in what form that knowledge comes, he must within a reasonable time bring his payments up to date * *."* (Emphasis supplied.)

The next question to be decided then is whether the Church has any equitable grounds to enforce specific performance. The crucial problem is whether the Church has been lulled into a false sense of security by the actions of Mrs. Hinkley. If, after the notice of cancellation, the Church had come forward within a reasonable time and tendered performance, it could then have enforced specific performance of the contract. The case of Boone v. Templeman, supra, and the Church's other authorities sustain that view.

Though the notice may have been ineffective to declare a forfeiture of the contract, yet it was sufficient to bring knowledge to the Church that the vendor was no longer willing to acquiesce in the continuing default. It thereby made it incumbent upon the Church to come forward to perform or offer to perform within a reasonable time if it would preserve its equities unless Mrs. Hinkley's subsequent conduct and the surrounding facts and circumstances were such that she should again be equit-

ably estopped from asserting the continued default by the Church.

After the notice was served, the Church made no objection to the attempted cancellation, instituted no efforts to raise the money to pay the balance due, nor asserted any rights under the alleged contract for a period of more than six years. The continued failure of the Church in this regard for that period of time was such that an inference of acquiescence on its part may fairly be drawn and was such as would naturally tend to induce plaintiff to act upon the theory that the Church itself had abandoned the contract. Neither party can deceive the other into a belief that prompt performance will not be required and then demand it if he would seek the aid of equity on his side. Onekama Realty Co. v. Carothers, supra.

A review of the evidence indicates that there was a general impression among the board of trustees or the governing body of the Church during the whole period after their default of January 1, 1940 that they were entirely at the mercy of Mrs. Hinkley and no reliance or faith in the contract existed among them. The witnesses Sharrit, who was the secretary and member of the board of trustees; Hirschey, another member of the board who worked as trust clerk in a title company; and the Rev. Sutton, pastor of the Church at the time, all testified in this tenor. As to the payment of the $45, the testimony of Sharrit and Hirschey is that they felt it was proper to pay for the use of the building so long as the

Church was permitted to occupy it. There is also an indication in the record that the $45 payment was the minimum rental value that Mr. and Mrs. Hinkley were willing to place on the property at the time the contract was initially executed and which would still allow them some return on the original investment.

The continued acceptance of the $45 monthly payments by Mrs. Hinkley taken in connection with other facts and circumstances such as the continued filing of application for tax exemptions on the property by the Church even after default on the basis of its use of the property for Church purposes, the addition of $4300 improvements to the property by the Church in 1944, the labelling by Mrs. Hinkley in the filing of her final account in probate of her husband's estate of money received as "contract payments" might well have led the trial court to infer that the contract was being continued. However, the trial court apparently inferred otherwise since the judgment was in favor of the plaintiff Hinkley. It is also a rule that the evidence must be considered in the light most favorable to sustaining the judgment.

As to the tenor of the testimony that the monthly payment of $45 was for the use and occupancy of the building, there is no direct showing to rebut it, nor indeed did the Church claim otherwise until after the notice of terminating the tenancy in October 1946 was served at which time the governing body of the Church had changed in membership and there were no records to

314

shed any light as to the intention of the parties at the time after default and after the notice of cancellation was served in June 1940. In fact witness Sharrit testified to some evidence of an oral agreement that Mrs. Hinkley would allow the Church to remain but that she would give them ample notice before demanding that the Church vacate the premises.

As to the expenditure of the $4300 by the Church in improving the property there is countervailing testimony to the effect that it was done upon the faith and belief by the Church that Mrs. Hinkley would soon donate the property to it as a memorial to her deceased husband.

Taking the record in its entirety, the judgment must be affirmed. The Church in its counterclaim is asking for specific performance of the alleged contract, an equitable remedy which is extraordinary and dependent upon the sound discretion of the court. Since equity follows the law we must examine the record to find what legal rights, if any, the Church has. From the judgment below, the trial court no doubt concluded that both parties by their actions had abandoned the contract. This abandonment took place after the notice of June 4, 1940 was delivered. Under the circumstances both parties had lost their rights under the contract and neither could sue for specific performance. A vendee in a contract for the purchase of land cannot lead the vendor to believe he has abandoned the contract and then when the land has increased in value secure the aid of equity to decree the specific performance of the contract. Glenn v. Lowther, 1927, 219 Ky. 383, 293 S.W. 947. So also a vendor having unreasonably delayed performance during which time land materially decreased in value is likewise not entitled to specific performance. Callicott v. Horn, 1931, 161 Miss. 395, 135 So. 215, 137 So. 190.

It is also a maxim that he who seeks equity must first do equity. In the instant case the Church has been in default on the payment of the principal balance for a period of almost seven years at the time this action was brought. Nowhere is there any evidence to explain nor excuse the long period of default so that equity can invoke its jurisdiction to grant relief. The truth of the matter is, as the record shows, the Church was unable at any reasonable time after the default to raise the money necessary to pay the balance due. It was not until the property had increased in value sufficient so that the purchase price of $20,000 could be borrowed on the property itself that the Church then raised the amount specified in the contract by arranging for a loan on the property. This is not a case where equity is enforcing a forfeiture, but rather declining to relieve against one where no equitable grounds for relief exists. Oconto Company v. Bacon, 181 Wis. 538, 195 N.W. 412, 40 A.L.R. 175.

Judgment Affirmed.

UDALL, C. J., and STANFORD, PHELPS and LA PRADE, JJ., concur.