L.K. COMSTOCK & COMPANY, INC., a New York Corporation; A. & M. Electric Company, also known as A. & M. Comstock, a New Mexico Corporation, Plaintiffs–Appellants,

v.

UNITED ENGINEERS & CONSTRUCTORS INC., a Delaware Corporation, Defendant–Appellee.

No. 87–2502.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 15, 1988.

Decided July 21, 1989.

As Amended Sept. 8, 1989.

David G. Lane, Venable, Baetjer and Howard, McLean, Va., for plaintiffs-appellants.

James A. Teilborg, Bruce A. Pelkey, Teilborg, Sanders & Parks, P.C., Phoenix, Ariz., for defendant-appellee.

Arthur E. Schwartz, Alexandria, Va., for the amicus curiae, Nat. Soc. of Professional Engineers.

Gerard W. Ittig, Robert H. Rubenstein, Kasimer & Ittig, Washington, D.C., Charles J. Wisch, Goldstein & Philips, San Francisco, Cal. and James W. Polk, West Sacramento, Cal., for the amici curiae, Nat. Elec. Contractors Ass'n, Inc. and Associated Gen. Contractors of California, Inc.

Before HUG, TANG and BOOCHEVER, Circuit Judges.

TANG, Circuit Judge:

## I. *Factual Background*

In order to comply with a New Mexico air quality control regulation, the Arizona Public Service Company ("APS") arranged for the construction of a particulate removal project ("PRP"). Specifically, on or about April 1, 1979, APS entered into a contract with general contractor United Engineers & Constructors, Inc. ("UE & C") in which UE & C agreed to construct the PRP.

UE & C then set out to arrange for subcontractors. A & M Electric Co. and L.K. Comstock & Co., Inc. formed a joint venture, A & M/Comstock ("A & M/C"), to submit a bid to UE & C. On July 13, 1981, UE & C entered into a subcontract with A & M/C whereby the latter was to install the electrical systems in the PRP. The subcontract is a lengthy document which also incorporates various appendices and attachments. The subcontract provides that Arizona law is to apply.

On June 23, 1982, UE & C cancelled the subcontract, claiming that A & M/C had failed to use its "Best Efforts" to complete the work in time to meet the PRP completion date. On June 24th, UE & C replaced A & M/C with another electrical subcontractor, Gardner–Zemke.

## II. *Procedural History*

On July 2, 1982, A & M/C filed a Complaint against UE & C in district court seeking damages for UE & C's alleged breaches and for wrongful cancellation of the subcontract. UE & C filed a counterclaim seeking damages for A & M/C's alleged breaches. A & M/C's Motion for Partial Summary Judgment was denied and the matter proceeded to trial.

The parties stipulated that the proceedings would be bifurcated, with the liability issues considered in one trial, and the dam-

ages issues considered in a second trial, if necessary. After a bench trial on the liability issues, the district court ruled that UE & C's cancellation of the subcontract was proper and that UE & C was entitled to recover from A & M/C the excess costs of reprocurement associated with the hiring of Gardner–Zemke. The parties later stipulated that judgment should be entered in favor of UE & C in the amount of $1,950,-000 (including attorney's fees) plus interest, subject to the outcome of this appeal. We have jurisdiction under 28 U.S.C. § 1291.

### III. *Standards of Review*

The "clearly erroneous" standard applies to findings of fact. F.R.Civ.P. 52(a); *Cataphote Corp. v. DeSoto Chem. Coatings, Inc.*, 356 F.2d 24 (9th Cir.), *cert. denied*, 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966). Issues of law are reviewed de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

The question of what standard of review applies to contract matters is not always so clearcut because "[t]he interpretation of a contract and the determination as to its breach are a mixed question of fact and law." *Libby, McNeill, and Libby v. City Nat'l Bank*, 592 F.2d 504, 512 (9th Cir.1978). In general, factual findings as to what the parties said or did are reviewed under the "clearly erroneous" standard while principles of contract interpretation applied to the facts are reviewed de novo. *Id.*

In *Culinary and Serv. Employees Union, AFL–CIO Local 555 v. Hawaii Employee Benefit Admin., Inc.*, 688 F.2d 1228 (9th Cir.1982), we stated that if "the district court relies upon extrinsic evidence to interpret an ambiguous contract, that interpretation is a factual determination reversible only if the district court's construction is clearly erroneous or if the court applied an incorrect legal standard." Furthermore, *In re U.S. Fin.Sec.Litig.*, we held that

[t]he determination of whether contract language is ambiguous is a matter of law.... When the interpretation includes a review of factual circumstances surrounding the contract, the principles of contract interpretation applied to those facts present issues of law which this court can freely review. *Libby*. When the inquiry extends beyond the words of the contract and focuses on related facts, however, the trial court's consideration of extrinsic evidence is entitled to great deference and its interpretation of the contract will not be reversed unless it is clearly erroneous. *Culinary*. 729 F.2d 628, 632 (9th Cir.1984).

More recently, in *Kern Oil & Ref. Co. v. Tenneco*, we again discussed the standard of review for contract cases:

Our standard of review in matters of this kind is not simple. Our position is as follows: "When the district court's decision is based on an analysis of the contractual language and an application of the principles of contract interpretation, that decision is a matter of law and reviewable de novo. When the inquiry focuses on extrinsic evidence of related facts, however, the trial court's conclusions will not be reversed unless they are clearly erroneous. The question of waiver of a contractual right is also a question of fact and subject to the clearly erroneous standard."

840 F.2d 730, 736 (9th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988) (citations omitted).

It is clear that when a district court interprets a contract without using extrinsic evidence, the standard of review is de novo. But:

[w]hen the inquiry focuses on extrinsic evidence of related facts, ... the trial court's consideration of extrinsic evidence will not be reversed unless they are clearly erroneous.

*Kern Oil*, 840 F.2d at 736. Thus, if the contract interpretation includes a review of factual extrinsic evidence, the findings of fact themselves are reviewed under the "clearly erroneous" standard, *Libby*, 592 F.2d at 512, but the principles of contract law applied to those facts are reviewed de novo. *U.S. Financial Securities*, 729 F.2d at 632.

### IV. Is the District Court's Decision "Procedurally Inadequate?"

A & M/C argues that the judgment of the district court should be vacated and remanded because its decision is "procedurally inadequate." To support this contention, A & M/C makes two arguments: that the district court's findings are skeletal and conclusory, and that the district court's "wholesale adoption" of the prevailing party's proposed findings was improper.

#### A. Alleged Skeletal and Conclusory Nature of District Court Findings

In *Unt v. Aerospace Corp.*, we observed that

> [t]he district court's findings certainly are not well done. They consist mainly of mere conclusions, preceded only by an unhelpful chronology of events. They do not articulate sufficient bases for the trial court's [conclusion].

765 F.2d 1440, 1444 (9th Cir.1985). But we nevertheless upheld the district court findings, noting that "despite the factual shortcomings, the basis for the court's decision is clear. The record gives substantial and unequivocal support for the ultimate conclusion ..." *Id.* Although A & M/C criticizes the district court's findings in the instant case, the alleged shortcomings are not nearly as egregious as those described in *Unt*, a case in which the district court's findings and conclusions were affirmed.

#### B. District Court's Verbatim Adoption of UE & C's Proposed Conclusions

A & M/C also argues that the decision of the district court should not be affirmed because its "conclusions of law" were generally taken verbatim from UE & C's Proposed Conclusions of Law. To support its position, A & M/C points to the case of *Photo Elecs. Corp. v. England*, 581 F.2d 772 (9th Cir.1978).

▆ It is true that in *Photo Elecs.*, we stated that the practice of "wholesale adoption" of the prevailing party's findings "has been disapproved," but we did conclude that the practice may be permissible in cases involving highly technical issues. 581 F.2d at 776–77.

The fact that the trial judge has adopted proposed findings does not, by itself, warrant reversal. But it does raise the possibility that there was insufficient independent evaluation of the evidence and may cause the losing party to believe that his position has not been given the consideration it deserves. These concerns have caused us to call for more careful scrutiny of adopted findings.

*Photo Elecs.*, 581 F.2d at 777 (footnote and citations omitted); *see also Kern Oil*, 792 F.2d at 1386. Indeed, "[t]he verbatim adoption of findings suggested by a party is not automatically objectionable ... so long as those findings are supported by the record." *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1444–45 (9th Cir.1985). When the district court's conclusions are adopted from the prevailing party's suggestions, even though the appellate court is to engage in "careful scrutiny," the "clearly erroneous" standard still applies. *Photo Elecs.*, 581 F.2d at 777.

Although the parties dispute the extent to which the district court adopted UE & C's proposed findings verbatim, even A & M/C acknowledges that the district court's conclusions do deviate somewhat from the suggestions of UE & C. This in itself indicates that the district court did not "uncritically accept" UE & C's proposals. *See Clady v. County of Los Angeles*, 770 F.2d 1421, 1427 (9th Cir.1985), *cert. denied*, 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986).

### V. Should A & M/C Have Been Estopped From Raising Ambiguity at Trial?

The district court ruled that A & M/C had an affirmative obligation prior to entering into the subcontract to seek explanation of the terms, and that by failing to meet this obligation, A & M/C is estopped from asserting ambiguity as a defense against UE & C's claim of breach. The district court also ruled that UE & C was justified in believing that A & M/C understood the meaning of the subcontract and had no need for additional clarification.[1]

1. These holdings are further examples of conclusions of law that the district court labeled as "findings of fact." As conclusions of law, the de novo standard of review should apply.

This issue presents a mixed question of law and fact. The district court's finding that UE & C relied on A & M/C's failure to seek clarification is a question of fact. Based on this factual finding, the estoppel of A & M/C is a matter of law. Under Arizona law, "[e]stoppel is applied to prevent injustice and when 'it would be unconscionable to permit a person to maintain a position inconsistent with one in which he had acquiesced.'" *Graham v. Asbury*, 112 Ariz. 184, 186, 540 P.2d 656, 658 (1975) (quoting *Holmes v. Graves*, 83 Ariz. 174, 177, 318 P.2d 354, 356 (1957)). Although UE & C may have relied on A & M/C's acquiescence of the contractual provisions, not to allow A & M/C later to claim that the subcontract is ambiguous would be inequitable. Indeed, the subcontract may not have been ambiguous at all from the perspective of A & M/C at the time it signed it, but nevertheless, its interpretation of certain contractual provisions may have been quite different from that of UE & C.

VI. *Should the District Court Have Considered Evidence of Custom and Trade Usage in Interpreting the Subcontract?*

A. Admissibility of Custom and Trade Usage Evidence

A & M/C argues that a court must first determine the existence of an ambiguity before it allows parol evidence, including evidence of custom and trade usage, to be admitted. The district court arrived at a contrary conclusion, ruling that trade usage can be used to determine whether a contract is ambiguous. In other words, according to the district court, a contract is not ambiguous if it is susceptible to a single interpretation according to the usage of trade, even if those terms are not susceptible to a single plain meaning.

In *Gray v. Headley*, 35 Ariz. 232, 238, 276 P. 523 (1929), a case relied upon by A & M/C, the Arizona Supreme Court held that because there was a clear understanding between the parties, parol evidence concerning the customary meaning of a contract term was inadmissible. The situation in the instant case is distinguishable since the parol evidence is needed to demonstrate the existence of a clear understanding between the parties.

In *Coury Bros. Ranches, Inc. v. Ellsworth*, 103 Ariz. 515, 521, 446 P.2d 458 (1968), another case cited by A & M/C, the court did state that "[c]ustom or usage is only justified when there is an ambiguity or uncertainty in the written instrument." In *Coury*, though, the contract explicitly and unambiguously provided for specific irrigation of land. The court excluded contradictory evidence of custom and usage regarding irrigation as violative of the parol evidence rule. In contrast, the extrinsic evidence in the instant case clarifies, rather than contradicts, the contractual terms.

Arizona law supports the district court's reliance on custom and usage. Specifically, parol evidence is admissible "to assist in the interpretation of the contract, or to prove the usages and customs in relation to which the parties contracted, thus allowing the addition of consistent terms of performance or the definition of words used in the contract." *Arnold v. Cesare*, 137 Ariz. 48, 51, 668 P.2d 891 (Ct.App.1983); *see also Rio Grande Oil Co. v. Upton Oil Co.*, 33 Ariz. 474, 479, 266 P. 3 (1928) ("[P]arole evidence is admissible to show that the terms used therein have acquired by the custom of the locality or by the usage of the trade peculiar significance.... [even though] the terms used may not of themselves appear to be ambiguous."). Furthermore, according to the *Restatement (Second) of Contracts* § 222(3) (1981) [2]:

> Unless otherwise agreed, a usage of trade in the vocation or trade in which the parties are engaged or a usage of trade of which they know gives meaning to or supplements or qualifies their agreement.

*See also Restatement (Second) of Contracts* §§ 219–21, 222(1–2), 223 (1981).

B. A & M/C's Failure to Object to Parol Evidence at Trial

**2.** Arizona courts follow the Restatement, absent contrary authority. *Bank of Am. v. J & S Auto Repairs*, 143 Ariz. 416, 694 P.2d 246 (1985).

■ UE & C further argues that because A & M/C failed to object to the introduction of custom and usage evidence at trial, it cannot raise the issue on appeal. It is of interest to note that the case cited by UE & C to support its argument on this point actually comes up with the opposite conclusion based on Washington substantive law. Specifically, according to *Anderson v. Owens*, 205 F.2d 940, 942 (9th Cir.1953), parol evidence may not be used to alter the terms of a contract "whether that evidence be objected to or not," though unlike the situation in *Anderson*, the parol evidence in the instant case is arguably used to clarify, not alter, the contract.

In fact, although there is a general principle that failure to object at trial to the admission of evidence constitutes a waiver of the right to appeal, *ESCO Corp. v. United States*, 750 F.2d 1466 (9th Cir.1985), this waiver principle is not applied to the admission of parol evidence in jurisdictions where the parol evidence rule is considered a rule of substantive law. 4 S. Williston, *A Treatise on the Law of Contracts* § 631, p. 961.[3] In Arizona, the parol evidence rule is a rule of substantive law. *Rental Dev. Corp. of Am. v. Rubenstein Constr. Co.*, 96 Ariz. 133, 393 P.2d 144 (1964).

### VII. *Did UE & C Properly Implement Changes?*

A. Subcontract Provisions

Section 11 of the subcontract deals with "Changes." According to Section 11.1 of the subcontract, UE & C "reserves the right for any reason without invalidating this Subcontract ... to make or to direct Changes in the Work ..." Furthermore, Section 11 also provides that in order to make changes, UE & C is to issue a "written Change Order" to A & M/C. The only exception to this procedure is "in the event of an emergency condition which endangers life or property" in which case UE & C could orally order Changes and confirm the changes with a written Change Order "as soon as practicable."

In Appendix A, the subcontract defines "change order" as "[a] change, addition, deletion or revision to this Subcontract, evidenced by a writing agreed to and accepted by both parties."[4] The question of changes is also considered in Section 3: "No changes of any of the provisions of this Subcontract shall be valid unless reduced to writing and signed by both parties."

Appendix E of the Subcontract deals with compensation and payment. According to Paragraph A of this Appendix, the total amount to be paid by UE & C to A & M/C is $4,986,994.00, as a lump sum. Paragraph B of Appendix E deals with the necessity of consideration for changes:

> In consideration of the potential for changes to the lump sum price of Paragraph A due to *engineering finalization* and field modifications of work within the overall scope defined in Appendix C, additional estimated funds are hereby authorized to this Sub-contract up to an amount not to exceed [$289,660.00], to be authorized by [UE & C] prior to work, as required. (emphasis added).

Finally, Section 33 of the subcontract deals with the order of precedence to be used in interpretation. Specifically, in the event of conflict between provisions of the subcontract and the appendices, the subcontract is to have priority over the appendices.

B. Analysis

UE & C argues that Section 11 is to be applied only to changes *outside* A & M/C's scope of work while changes *within* A & M/C's scope of work are covered under Appendix E. A & M/C replies that there is no basis for this distinction. A & M/C argues that UE & C did not honor the Changes Clauses when changes were made

---

**3.** See *also Matter of Penn–Dixie Indus., Inc.*, 22 B.R. 794, 797 (S.D.N.Y.1982) ("Even if there is no objection to parol evidence by the litigants, the court should nevertheless exclude parol evidence from its consideration since this rule is not a rule of evidence, but rather a rule of substantive law.").

**4.** Furthermore, the subcontract defines "change" as "[a]ny addition, deletion, or alteration to the work, terms, or provisions of this Subcontract and/or the addition, deletion of alteration of any service or work ancillary to or related to, in any manner, the work performed under this Subcontract."

for engineering finalization, complaining that it was expected to perform work required by informal design changes conveyed by handwritten notes, speed memos, and field sketches. Thus, the crux of the dispute deals with the viability of UE & C's "engineering finalization" concept.

UE & C points out that questions regarding drawings, plans, and specifications are inevitable on any construction project.

> In its efforts to assist A & M/C with the installation, UE & C occasionally provided A & M/C with informal sketches or diagrams to help explain the drawings. Although these informal aids were not always incorporated into the subcontract by change order, UE & C's engineers took responsibility for these drawings by initialling or signing them. UE & C always made sure that A & M/C were compensated for work which was performed pursuant to such drawings, etc.

*Appellee's Opening Brief* at 31–32.

Basically, then, UE & C defends its practice as a manifestation of the "engineering finalization" concept. Under this concept, if new, different, or extra effort was required on a portion of the work already within A & M/C's scope, UE & C prepared a work authorization form summarizing the modifications, which was approved by representatives of both parties. Change orders were subsequently issued which would incorporate these work authorizations. According to UE & C, it was accepted practice between the parties that a change order on any particular item might be issued some time after the information covered by the change order had been transmitted to A & M/C.

The district court explicitly found that the subcontract's definition of "change order" is not vague, ambiguous, and/or contradictory. The court also found that the subcontract was not ambiguous as to those circumstances under which A & M/C was required to perform extra or changed work in the absence of a formal change order, but that the provisions of Section 11 "were not uniformly followed by either party."

Also, the district court found that certain changes were made in the various systems covered by the Appendix D milestone dates, but that these changes are

> normally expected and should not have impaired A & M/C's ability to meet the milestone dates. Such changes occurring after a particular milestone date would have been covered by the engineering finalization portion of Appendix E.

ER 178. Indeed, the court found that A & M/C should have used additional shifts and/or overtime in order to complete the work within the time specified, although UE & C did not offer A & M/C payment for overtime and/or additional shifts.

The district court also found that the number of changes in the drawings and engineering plan furnished by UE & C to A & M/C

> was not in excess of industry standards or otherwise unreasonable. Because of its size, type and complexity of the job, of the "fast track" nature of the job, of which A & M/C was aware, A & M/C knew or should have known that it would be required to accommodate such changes, erros, and revision into its bid and planning.

ER 182–183.

Finally, although both parties characterize the project as "fast track,"[5] this concept is not mentioned anywhere in the subcontract. Thus, since the subcontract unambiguously outlines the procedures for making changes, the subcontract itself would normally prevail. Despite the potential attractiveness and feasibility of UE & C's "engineering finalization" concept, its methodology for making changes does not strictly conform with the terms of the subcontract.[6] Indeed, as we have noted, the

---

5. The fast track process has been defined as "'method of construction by which actual construction is commenced prior to the completion of all design, planning, bidding, and subcontracting stages in order to alleviate the effects of inflation.'" Squires & Murphy, *The Impact of Fast Track Construction and Construction*

*Management on Subcontractors,* 46 L. & Contemp. Probs. 55, 56 (1983).

6. It does seem unreasonable to require a contractor to complete a Change Order to order the most trivial alterations in a subcontractor's work, particularly on a "fast track" job. As amicus for UE & C argues, the drawings and

district court found that UE & C did not abide by Section 11.

## C. Conclusions

■ We agree with the district court that the requirement of formal change orders may be waived by mutual assent of the parties. Indeed, the conduct of both parties in implementing changes at the construction site constitutes such assent. Furthermore, under principles of equity, A & M/C is estopped from relying on the formal change order requirement. Again, as we have mentioned, under Arizona law, "[e]stoppel is applied to prevent injustice and when 'it would be unconscionable to permit a person to maintain a position inconsistent with one in which he had acquiesced.'" *Graham v. Asbury*, 112 Ariz. at 186, 540 P.2d at 658. Thus, even though UE & C's methodology for implementing changes did not strictly conform to the terms of the subcontract, A & E/C may not obtain relief on these grounds.

## VIII. *Were UE & C's Engineering and Design Adequate?*

A. Does the "Spearin Doctrine" apply to create an implied warranty on the adequacy of UE & C'S design plans?

A principle in construction law is that contractors impliedly warrant the adequacy of the plans and specifications which they supply and require subcontractors to follow. *Chaney Bldg. Co. v. City of Tucson*, 148 Ariz. 571, 574, 716 P.2d 28 (1986). This principle is known as the Spearin doctrine. *United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918) ("... if the contractor is bound to build according to plans and specifications pre-

pared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications.") [7]

Throughout the course of its performance, A & M/C claims to have routinely complained about errors, inaccuracies, and omissions in the plans and specifications furnished by UE & C. A & M/C thus argues that UE & C breached this implied warranty under the Spearin doctrine. The district court, however, did not find that the delays resulting in termination of the contract were caused by faulty plans and specifications. It found the delays attributable to A & M/C's:

a) Failure to properly man the job.

b) Failure to properly plan the work.

c) Failure to provide sufficient field engineering.

d) Failure to provide material in a timely fashion.

e) Failure to supervise and control the work force.

f) Inability to cope with craft problems and craft interferences.

g) Overall lack of performance.

(Finding of Fact 67). The findings are not clearly erroneous.[8]

B. Should the Burden of Completing UE & C'S Design Have Been Placed on A & M/C?

■ A & M/C disputes the rulings of the district court that A & M/C "assumes responsibility for the field engineering required on the project ...," and that A & M/C "had the responsibility under the Subcontract to perform the necessary field engineering in order to accomplish the electrical installation work [including] the design

specifications developed by UE & C were only intended to embody the basic design concepts to give guidance to A & M/C; "they were not intended to detail each and every method and procedure for A & M/C." On the other hand, the subcontract provides that in order to make *any* changes, a Change Order, to which both parties agree, must be formally issued. To allow a contractor a free hand in ordering changes without following this contractual procedure, in the words of amicus for A & M/C, causes "A & M/C [to be] held responsible for anticipating and accommmodating changes made at any time by UE & C without regard to the time-related impacts on A & M/C's cost and performance."

7. It is true, however, that a design professional is not held to a standard of perfection. *Donnelly Constr. Co. v. Oberg/Hunt/Gilleland*, 139 Ariz. 184, 187, 677 P.2d 1292, 1295 (1984).

8. These findings are in direct contrast with those of the jury in *Frank Briscoe Co. v. Clark County*, 857 F.2d 606 (9th Cir.1988). The *Briscoe* jury found that the county's breach of the contract was the cause of Briscoe's delay in completion of its work. We specifically held, however, that the court should have instructed the jury that "Briscoe, by entering into the contract, warranted that it could complete the project within the specified time." *Id.* at 612.

responsibility for exposed paths."[9] ER 184. These engineering responsibilities were imposed on A & M/C "as a matter of both contract interpretation and custom in the industry." ER 195. As the district court noted:

As a matter of law, the responsibility for field engineering lies with the party to whom that responsibility is given under the terms of the construction contract. When the contract does not specifically identify the party whose responsibility it is to perform the field engineering, that responsibility lies with the subcontractor according to the custom within the industry. Accordingly, any delays resulting from A & M/C's failure to perform the necessary field engineering cannot be attributed to UE & C. A & M/C's failure to perform adequate field engineering was a major contributing factor to the delays which it experienced.

ER 204.

Basically, A & M/C apparently does not dispute that it had some design or engineering responsibilities, but argues that it did not have as much responsibility as found by the district court. More specifically, the court found that "A & M/C had the responsibility of detailed design of the tray supports[10] as well as field engineering necessary to install the cable tray raceways."[11] ER 168. Also, the court found that "[c]onduit routing was the responsibility of [A & M/C] except where dimensioned on the drawings. CASP[12] was also to provide certain identification." ER 168.

The technical details of the work to be performed by A & M/C are outlined in the attachment to the subcontract labeled "Specification for Electrical Installation." Section 1 of these specifications ("Scope")

mentions "design" as one of tasks to be furnished. This appears to be the only place in the subcontract in which the allocation of design or engineering responsibility is discussed. Indeed, A & M/C argues that this provision should be interpreted very narrowly. Further evidence on this issue is derived from custom and usage.

Under Arizona law, custom and usage must be established by "clear and satisfactory" evidence. *Sam Levitz Furniture Co. v. Safeway Stores, Inc.*, 10 Ariz.App. 225, 228, 457 P.2d 938 (1969), *vacated on other grounds*, 105 Ariz. 329, 464 P.2d 612 (1970). The dispute on this issue essentially boils down to an assessment of the expert testimony. The district court's findings are to be upheld unless clearly erroneous. *Kern Oil*, 840 F.2d at 736.

A & M/C argues that the testimony and documentary evidence adduced at trial do not support the district court's conclusions as to the use or existence of a trade usage with respect to field engineering. A & M/C quotes specific testimony of experts to support its argument. In response, UE & C argues to the contrary.

The issue of whether custom and usage dictates broad design and engineering responsibilities for A & M/C is a close factual question involving the weighing of different evidence including expert testimony. As such, we give substantial deference to the findings of the trial court and leave its conclusion undisturbed.[13]

## IX. *Were UE & C'S Scheduling and Coordination Efforts Adequate?*

### A. Subcontract Provisions

The portions of the subcontract dealing with scheduling are Section 6, Section 10.-

---

9. "Exposed path" is defined in the subcontract as the "[t]erm used in CASP to indicate a route between two points, without specifying conduit, tray or wrap."

10. "Cable tray support" refers to "[l]ight steel members used to support cable tray to the building structural steel.

11. A "cable tray" is "[a]n assembly of two or more insulated wires within a common insulated sheath. A "raceway" is "[a]ny channel for holding wires and cables; on the PRP, generally steel conduit and cable tray."

12. CASP is a computerized conduit and cable schedule. It is a computer program designed to aid engineering and construction in the routing and installation of cables in an optimum manner.

13. Also persuasive is the fact that the replacement subcontractor completed the work using the same plans and specifications that were given to A & M/C.

15, Appendix D, and Appendix G. Specific milestone dates[14] are listed in Appendix D.

According to Section 2.1 of Appendix G ("Contractor's Schedule"), UE & C was to furnish a copy of the "Project Critical Path Schedule"[15] to A & M/C, but A & M/C was to "be responsible to plan and schedule all his work within the project schedule." Section 3.1 of Appendix G provides that A & M/C is to give to UE & C a "detailed CPM[16] erection schedule factoring in the milestone dates noted on the Project Critical Path Schedule"[17] A & M/C was also required to provide UE & C with monthly updates and reports of progress.

Also, according to Section 6, A & M/C was to prepare and submit promptly to UE & C quantity and manpower charts that are coordinated with the construction schedule. Then, UE & C was to review the charts and perhaps request that they be revised. ER 222.

## B. Arguments and District Court Findings

A & M/C argues that UE & C ignored the scheduling ground rules established by the subcontract. The district court found that A & M/C breached its contractual obligations by failing to provide UE & C with a detailed CPM schedule, together with monthly updates, as required by the express terms of Appendix G, and by failing to submit the required monthly manpower curves. According to the district court, the failure to submit these materials prevented UE & C from assisting A & M/C with problems it encountered.

With respect to the causes of the delay, the district court found as a matter of fact

that A & M/C "was at times delayed by the lack of cable tray, conduit, cable and other materials, all of which were the responsibility of A & M/C to timely order and have delivered." ER 178. Furthermore, "[h]ad A & M/C played an active role in [the weekly construction] meetings, it would have been able to better forecast the availability of various areas and thus plan and schedule its own work in an efficient manner." ER 187. Finally, also affecting the issue of scheduling, the district court made a factual finding that "A & M/C did not promptly or prudently order sufficient materials which effected its ability to perform." ER 188.

A critical point is that the ISSUE milestone dates are inconsistent with the Appendix D milestones. A & M/C argues that since it is required under Section 3.1 of Appendix G to furnish a schedule "factoring in the milestone dates noted on the [ISSUE Schedule]," any supposed inconsistencies between the ISSUE schedule and the Appendix D milestones would be of great importance. Clearly, there are some ambiguities and points of contention concerning the purpose of the ISSUE schedule as well as obligations under Appendix G.

The district court found that the ISSUE schedule, as originally issued by UE & C or as subsequently revised, "while sometimes delayed and incomplete, was sufficiently accurate and detailed to enable A & M/C to adequately plan and schedule its work based upon completion of activities by others." ER 169. This appears to be a finding of fact which is not clearly erroneous. Furthermore, regardless of the prob-

---

**14.** Milestone dates are the deadlines for when A & M/C was to furnish the specified services. For example, the milestone date for "start installation of tray and conduit under baghouse" for Unit 4 was July 6, 1981.

**15.** The Project Critical Path Schedule was known as "ISSUE." "ISSUE" refers to "UE & C's computerized schedule system, a precedence type network. The system calculates the various construction paths and the anticipated completion date of activities based on the activities, their duration and the sequence in which the activities are to be constructed."

**16.** Critical Path Method.

**17.** For example, for the task "start installation of tray and conduit under baghouse" in Unit 4 which had a milestone date of July 7, 1981 as per Appendix D, the June 30, 1981 CPM ISSUE update indicated an "early start" date of August 25, 1981 and a "late finish" date of November 4, 1981 for this job. An early start date is the earliest date than an activity can start based upon the logic of the CPM activities. The late finish date is the latest date that an activity can finish without impacting the project completion date.

lems with Appendix G and the ISSUE schedule, A & M/C was nevertheless still obligated to meet the milestone dates set out in Appendix D. Indeed, according to Section 33.1 of the subcontract, Appendix D has precedence over Appendix G. Thus, A & M/C should not be complaining about UE & C's scheduling.

## X. *Were UE & C'S Coordination Efforts Adequate?*

### A. Subcontract Provisions

According to Section 2 of Appendix D:

Other Subcontractors and sub-subcontractors will be engaged in ongoing activities both in the same area and possible the same system. Coordination of work activities shall be the responsibility of the Sub-contractor with ultimate resolution or direction remaining with the Contractors Resident Construction Manager.

Section 4 of Appendix D lists milestone dates for work to be completed by subcontractors other than A & M/C. The introductory paragraph to this section provides in part that:

The following milestone dates are for work by Others and are provided for the Subcontractor's information and use in coordination his work with other Subcontractor's work.

Section 4 further provides that "... area availability denotes access availability only. Coordination of work activities shall be the Subcontractor's responsibility."

Other references to A & M/C's coordination responsibilities are in the Specifications. Part 1.2 of Section III of the Specifications provides that A & M/C

is required to avoid interferences. Avoidance of interferences includes coordination of installation sequences and locations relative to this and other [A & M/C]'s work with [UE & C]. [UE & C] will determine final sequences and locations.

*See also* Section 10.15 of the subcontract.

### B. Arguments and District Court Findings

██ A & M/C complains that UE & C abrogated its contractual responsibility for coordination of A & M/C's work with the activities of other subcontractors. For example, A & M/C contends that UE & C wrongfully "withheld" information on other subcontractors' schedules. Although A & M/C discuss in detail how much it needed this information, it does not cite any provision of the subcontract which gives it the right to the information.

UE & C's position is that A & M/C's failure to provide a detailed construction schedule as required under the subcontract, together with monthly updates, effectively prohibited UE & C from performing its scheduling and coordination functions. UE & C further contends that UE & C was not required to provide to A & M/C the schedules of other subcontractors, and that A & MC's failure to attend the weekly construction meetings prevented A & M/C from obtaining the information that it wanted. In this regard, the district court found that

A & M/C failed to perform its obligation under the Subcontract by failing to take an active and meaningful part in the weekly construction meetings held at the job site. Had A & M/C played an active role in those meetings, it would have been able to better forecast the availability of various areas and thus plan and schedule its own work in an efficient manner.

ER 187.

The wording of the subcontract points to A & M/C as having primary coordination responsibilities. A & M/C argues that its coordination responsibilities are limited to coordination of its work with work being performed concurrently by others "in the same area or system." While this is plausible, the better interpretation of the subcontract is that A & M/C had broader coordination responsibilities.

A & M/C cites cases supporting the existence of a contractor's implied duty to coordinate the work of its subcontractors. There are two problems with this argument. First, there is no indication that such an implied duty exists under Arizona law. Second, even if such an implied duty

did apply, the existence of express contractual language to the contrary would nullify the implied duty. We agree with the conclusion of the district court on this issue.

### XI. *Was A & M/C Entitled to Any Time Extensions?*

#### A. Start–Up Schedule

■ Much of the dispute on this issue concerns start-up schedules.[18] The district court's findings with respect to the start-up schedule are as follows: The APS start-up schedule was prepared by APS with assistance from UE & C, and was found to be "reasonable." A & M/C requested a start-up schedule in September 1981 and received the schedule on January 22, 1982; the schedule was provided to A & M/C to assist it in meeting its milestone dates. The start-up schedule, which was incorporated into UE & C's ISSUE schedule, called for a float[19] beyond each milestone date. Furthermore, by allowing A & M/C to adjust its performance to meet the start-up schedule, UE & C *relaxed* A & M/C's performance, rather than *accelerating* the milestone dates. These findings are factual or based on extrinsic evidence so that the "clearly erroneous" standard applies.

The district court also found that A & M/C's obligation to meet the Appendix D milestones was not changed when A & M/C received the start-up schedule. In fact, according to the district court, UE & C was not obligated to provide A & M/C with the start-up schedule and A & M/C should not have waited to receive the schedule before performing its work.[20] Indeed, had A & M/C been performing on schedule according to the Appendix D milestones, it would not have been necessary for A & M/C to have received the APS start-up schedule.

18. The "start-up schedule" is the schedule that the APS Start–Up Organization prepared in order to check out, test, and actually energize the equipment.

19. The difference between the earliest allowable completion date and the latest allowable completion date is the "float."

Although A & M/C complains in detail about the start-up schedule, it does not present very persuasive arguments, based on the terms of the subcontract, to indicate that the findings of the district court should be reversed. But the information contained in the start-up schedule is ultimately not relevant, as A & M/C had contracted to perform according to the milestone dates in Appendix D.

#### B. Time Extensions

The part of the subcontract that deals with time extensions is Section 14.1. Specifically, according to Section 14.1.4, UE & C could grant a time extension because of delays due to causes beyond A & M/C's control. The district court found that A & M/C was not delayed and should have completed the work on time as per the Appendix D milestones, and that it was not entitled to a time extension. The district court also found that A & MC may not validly claim it was precluded from timely performance of the subcontract as a consequence of UE & C errors because A & M/C did not follow the procedures for reporting errors set out in Section 21.5 of the subcontract.

There may be merit to A & M/C's argument that its entitlement to time extensions was not waived by the "No Damages for Delay" clauses of Appendix D and Section 10.15 of the subcontract. Nevertheless, we need not address the merits of this argument because A & M/C fails to provide a convincing argument as to why it was even entitled to a time extension.

### XII. *Was A & M/C Entitled to Receive a 48–Hour Notice of Cancellation?*

#### A. Cancellation Provision in Subcontract

According to Section 17.1 ("Cancellation") of the subcontract:

20. A & M/C argues that these findings "cannot be reconciled" with the district court finding that A & M/C was in breach for not performing in accordance with the start-up schedule. Actually, the findings can be reconciled when one considers the district court finding that the Appendix D milestone dates are consistent with the start-up schedule.

Should [A & M/C] at any time violate any part of this Subcontract, ... [UE & C] may declare this Subcontract cancelled for default and will so notify [A & M/C] in writing. Upon receipt of any such written notice of default, [A & M/C] shall undertake immediate steps to remedy such default. Should [A & M/C] fail to remedy such default within forty-eight (48) hours after receipt of such written notice, [UE & C] may, in writing, without notice to [A & M/C's] sureties, fully cancel [A & M/C's] right to proceed with the Work as to which default has occurred and/or cancel this Subcontract and take whatever steps may be necessary to assure a completion of the Work referenced herein, without affecting any other right or remedy which [UE & C] may have at law or under this Subcontract.

According to Section 16.1 ("Termination") of the subcontract:

At its sole discretion at any time during the performance of this Subcontract, [UE & C] may terminate this Subcontract, or may terminate all of any portion of the Work not then completed, by giving [A & M/C] written notice of such termination.

## B. Cancellation Letter

In a June 23, 1982 letter, at which time A & M/C was "at least eleven weeks behind and their ability to meet the December 31, 1982 deadline was seriously in doubt," Mr. Case of UE & C cancelled the subcontract with A & M/C:

... as stipulated in Section 17, CANCELLATION, and without limiting the generality of our rights to take this action, A & M/C is hereby notified that due to A & M/C's failure to prosecute the work according to the Subcontract terms, we declare the Subcontract cancelled for default.

ER 583.

Regarding the 48-hour notice requirement of Section 17 of the subcontract, Mr. Case wrote:

Inasmuch as the past attempts by you to remedy the default have failed, and your current programs do not provide assurance against further failures, full cancellation of the Subcontract shall take effect at 4:00 pm today, at which time your right to proceed with the work is terminated. To eliminate further delays, there will be no 48–hour period after receipt of this notice because you have already advised us that your remedy would be to convert your Subcontract to a cost reimbursement arrangement and we are not obliged to accept that as a solution in the light of your past failures.

*Id.*

## C. Motion for Summary Judgment and District Court Findings

In a motion for partial summary judgment, A & M/C argued that Section 17, quoted above, provided the exclusive method of canceling the subcontract, and that UE & C was in breach for failing to give the requisite 48–hour notice. The district court denied the motion concluding that Section 17 only applied to "breaches curable in 48 hours." Because of the "vital breach" by A & M/C, UE & C "had a right to cancel independent of Section 17." ER 28. Also, UE & C's cancellation was ruled not a material breach of the subcontract.

After trial, the district court ruled that the terms of Section 17 are not vague, ambiguous, or contradictory and that the opportunity to remedy default within 48 hours refers to breaches capable of being cured within 48 hours and provided an additional option to UE & C. Specifically, the court found that UE & C had properly cancelled the subcontract as per Section 16.1, Section 17 notwithstanding. Although UE & C argues for a "clearly erroneous" standard of review, this is purely a matter of contract interpretation which is reviewed de novo. *Kern Oil*, 840 F.2d at 736.

## D. Discussion

In its brief, A & M/C cites Arizona Court of Appeals cases to support its argument that where a cancellation provision is included in the contract, it constitutes the

exclusive means of cancellation.[21] A & M/C's contention is that when UE & C cancelled the subcontract without notice, it repudiated the subcontract and cannot now enforce its terms.

A & M/C's argument is weak for a number of reasons. First, the cases cited by A & M/C are either irrelevant or distinguishable. Second, the subcontract in the instant case does not contain a singular cancellation provision but arguably has two Sections providing for cancellation or termination: Section 16.1 and Section 17.1.

■ Third, even if Section 17 were the only operative contractual provision dealing with cancellations, the district court's interpretation of that Section, based on a distinction between "curable" and "vital" breaches, is sound. In discussing *Olin Corp. v. Central Indus., Inc.*, 576 F.2d 642, 647 (5th Cir.1978), one prominent commentator noted that the case presents a situation where

> Olin could have terminated as it did despite contract provisions that the 90 day notice should be *exclusive.* The notice provision assumed that the breaches which would be used to terminate the contract would be *curable* breaches. There was a *frustration of purpose* when [the] breach ... occurred.... [Since] Central's breach was a *vital* breach, it would have been sufficient to allow Olin to rescind the contract even if the contract had ... *no right of termination at all;* it seems strange to suggest that the right of immediate termination is lost because the parties expressly provided a means of terminating for lesser, curable breaches.

2 *Corbin on Contracts* § 1266, p. 442 (C. Kaufman supp.1984) (emphasis in original).

Finally, since A & M/C was so far behind schedule, and since it could not have cured its breaches within 48 hours, for UE & C to give a 48–hour notice would have been a useless gesture in terms of any benefits to A & M/C. Furthermore, particularly since the replacement contractor was on site within the 48–hour period, giving the 48–hour notice would have further delayed UE & C's work. "The law does not require a useless act, particularly where ... it would only enhance the actor's loss." *United States v. Buffalo Coal Mining Co.*, 343 F.2d 561, 565 (9th Cir.1965) (footnote omitted).

### XIII. Did UE & C Violate its Obligation to Deal in Good Faith with A & M/C?

■ Under Arizona law, there is an implied covenant of good faith and fair dealing in every contract. *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 710 P.2d 1025, 1038 (1985); *see also Restatement (Second) of Contracts* § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.")

The district court found that UE & C acted in good faith. Because the issue of acting in good faith is largely factual, the "clearly erroneous" standard of review applies. A & M/C argues that UE & C breached this implied covenant and that the district court's findings should not stand.

A & M/C's sole argument in this regard is that UE & C internally acknowledged its responsibility for significant portions of the delays. Considering all the evidence as a whole, A & M/C's argument that the district court's rulings on this issue should be reversed is not persuasive.

AFFIRMED.

**21.** *Horizon Corp. v. Westcor, Inc.*, 142 Ariz. 129, 688 P.2d 1021, 1028 (App.1984); *Blackmore v. Honnas*, 141 Ariz. 354, 687 P.2d 362, 364 (App. 1984); *Rancho Pescado, Inc. v. Northwestern Mut. Life Ins. Co.*, 140 Ariz. 174, 680 P.2d 1235 (1984); *Secan v. Dunbar*, 139 Ariz. 503, 679 P.2d 526 (App.1983); *O'Hare v. Griesmer*, 132 Ariz. 30, 643 P.2d 733 (App.1982); *Thermo–Kinetic Corp. v. Allen*, 16 Ariz.App. 341, 493 P.2d 508 (1972); and *Glad Tidings Church of Am. v. Hinkley*, 71 Ariz. 306, 226 P.2d 1016 (1951).