952 F.2d 1399
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
MICRONESIAN YACHTS COMPANY, LTD. and Douglas F. Cushnie,
Plaintiff-Appellant,
v.
BANK OF GUAM, Defendant-Appellee.
 No. 90-16663.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 8, 1991.
Decided Jan. 15, 1992.
 
 Before ALARCON, D.W. NELSON and CANBY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 Micronesian Yachts Company ("MYC") is a corporation organized under the laws of the Commonwealth of the Northern Mariana Islands ("CNMI"). FOF# 1.[1] Douglas F. Cushnie, ("Cushnie") is a resident of CNMI and the president and principal shareholder of MYC. FOF# 2, 4. MYC applied to the Bank and 3 other lenders for a $175,000 loan to purchase and refit a yacht to start a charter business in Micronesia. FOF# 7. The Bank agreed to lend MYC the money at a minimum of 14% interest, payable in 3 years. The loan agreement was signed on March 23, 1983 ("3/23 contract").[2] MYC would make its first payment of principal and interest on August 15, 1983. The parties agreed that upon request from MYC, the Bank would disburse the funds. This agreement is not included in the 3/23 contract; however, its existence is not disputed. The parties do dispute whether the 3/23 contract required MYC to make monthly interest payments prior to August 15.
 
 
 3
 In August 1983, MYC requested an extension of time to make the first payment of principal and interest. On September 14, 1983 they signed a revision agreement ("9/14 agreement"), giving MYC until November 15, 1983 to make the first payment. The 9/14 agreement included an explicit provision requiring monthly interest payments to be made during the interim period.
 
 
 4
 In October 1983, MYC asked the Bank for its help in obtaining a $225,000 loan guarantee from the Small Business Administration ("SBA"). MYC submitted an application to the Bank for an SBA guaranteed loan. In December 13, 1983, the Bank denied the application.[3] In January 1984, MYC asked again for the Bank's assistance in obtaining an SBA loan guarantee. FOF# 21. On March 24, 1984, the Bank denied MYC's application because MYC's existing loan was in default and projections showed the next year's cash flow and profits would be minimal. FOF# 23. MYC did not apply for any other loans during this period.
 
 
 5
 In July 1984, MYC asked the Bank for assistance in obtaining a loan from the Economic Development Loan Fund ("EDLF").[4] On September 18, 1984, the Bank requested the EDLF give MYC a loan guarantee. On October 15, 1984, MYC told the Bank that it wanted a "development type of loan", with a longer term and lower interest rates in order to pay off the Bank loan, not a guarantee. FOF# 26. On October 22, 1984, the Bank requested the EDLF approve MYC's application for a direct loan. On June 7, 1985, the EDLF approved a $200,000 loan. FOF# 31.
 
 
 6
 On August 7, 1985, MYC wrote to the Bank suggesting that it forgive one year of interest as compensation for the Bank's delay in helping MYC get another loan. FOF# 39. MYC stated its intention to use part of the EDLF loan to pay off the principal and that the matter of interest was subject to negotiation. The Bank responded that it was unwilling to retire the loan on MYC's terms because MYC was in default.[5] FOF# 35. In October, 1986, the Bank finally agreed to accept $200,000 and a $28,800 note from Cushnie to retire the loan. FOF# 37.
 
 
 7
 MYC filed a complaint in the District Court of the Northern Mariana Islands in December 1987, alleging breach of contract, intentional and negligent misrepresentation, fraud, breach of the duty of good faith and fair dealing and antitrust violations. A three day trial was held in February 1990. The district court entered judgment for the Bank on all counts. We affirm the district court's judgment.
 
 STANDARD OF REVIEW
 
 8
 The standard of review applied in contract matters is "not always clearcut because 'the interpretation of a contract and the determination as to its breach are a mixed question of fact and law.' In general, factual findings as to what the parties said or did are reviewed under the 'clearly erroneous' standard while principles of contract interpretation applied to the facts are reviewed de novo."[6] L.K. Comstock & Co. v. United Engineers and Constructors, Inc., 880 F.2d 219, 221 (9th Cir.1989). Under the clearly erroneous standard, a lower court's findings of fact will not be disturbed unless the appellate court has a "definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).
 
 DISCUSSION
 
 9
 1. Did the 3/23 contract require MYC to make monthly interest payments before August 15 1983?
 
 
 10
 MYC claims that the Bank demanded it make monthly interest payments, not required by the 3/23 contract, before the Bank would release any funds. The Bank claims that monthly interest payments were required under the contract. The district court agreed with the Bank. COL# 1, 2. The 3/23 contract states that interest would accrue between March 23 and August 15, but there is no provision for interest payments to be made prior to August 15. In fact, when the loan was revised, a "SPECIAL NOTE: Interest is to be paid monthly during this revision period" was added to the 9/14 agreement. Since there was no requirement that interest be paid before August 15, the Bank's conditioning disbursement of funds on receipt of interest would have been a breach of the 3/23 contract.
 
 
 11
 However, the Bank claims that it disbursed funds even though MYC had not paid the interest. The evidence supports the Bank's contention. The Bank sent its first invoice for interest due on June 13, 1983, which was paid on June 17, 1983. Prior to June 13, the Bank made five disbursements, totaling $139,000. Between June 17, 1983 and September 2, 1983, when MYC made its next interest payment, the Bank sent three invoices for interest due. During this time, the Bank made five more disbursements, totaling $25,082. The Bank was wrong in requiring MYC to make the interest payments, but it did not condition disbursement on the interest payments being current.
 
 
 12
 1(a). Did the Bank unreasonably delay disbursing funds, preventing MYC from a timely start in its business?
 
 
 13
 There are three incidents in which MYC claims the Bank unreasonably delayed disbursing funds. MYC claims that these delays caused a delay in refitting the yacht at a shipyard in San Francisco, which delayed sailing the yacht to the CNMI, which led to yet another delay in taking publicity photos and printing promotional materials. All in all, MYC claims the Bank's delay in disbursing funds prevented MYC from starting its business for eight months.
 
 
 14
 The first request was made on April 4, 1983 for $6,000 for yacht repairs; the funds were disbursed on May 20, 1983. The second request was made on July 1, 1983 for $5,000; the funds were disbursed on July 14, 1983. The third request was made on August 18, 1983 for $5,000; the funds were disbursed on September 2, 1983.
 
 
 15
 The district court found that all the disbursements were "made in a timely and commercially reasonable manner." We need not decide whether that finding is clearly erroneous, because the district court also found that the delays in refitting the yacht were "due primarily to the catch-as-catch-can availability of skilled artisans," and were "largely unrelated to the alleged delays in the requested disbursements." FOF# 14. The district court also found that such delays in refitting should have been anticipated by MYC in its requests for disbursements. Id. These findings are supported by the evidence and negate the possibility that any delay in disbursements was the cause, beyond a point of de minimis, of delay in the launching of MYC's business.
 
 
 16
 2. Did the Bank misrepresent MYC's chances of obtaining an SBA guarantee?
 
 
 17
 MYC claims the Bank knew in October, 1983 that MYC would never be able to get an SBA guarantee because MYC could not repay its Bank loan. MYC further claims the Bank never informed MYC of this fact, but instead let MYC make futile attempts to obtain an SBA guarantee, in order to keep MYC paying the Bank's high interest rates. MYC also claims that due to this negligent misrepresentation, it did not look elsewhere for a loan.
 
 
 18
 In a business transaction, "one who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting, ... is subject to liability ... if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question." Restatement (Second) Torts § 552(1) (1977).
 
 
 19
 2(a). Did the Bank owe MYC a duty to disclose?
 
 
 20
 Restatement (Second) Torts § 552(2) states that a "party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated; (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them ..." MYC does not claim that the Bank was a fiduciary. However, it does claim that it put its trust and confidence in the Bank. The Restatement's list of "similar relations" does not include bank-borrower. The relationship between a bank and borrower is not the type of relationship encompassed by the rule. The bank, as a lender, is not working for the benefit of the borrower. The bank wants to maximize its profits on the loan, while the borrower wishes to minimize the cost of the loan. Both parties are acting in their own self-interest. The Bank, as lender, was not in a position, vis-a-vis MYC as borrower, where it had a duty to disclose MYC's chances in obtaining an SBA guarantee.
 
 
 21
 2(b). Was it a misrepresentation for the Bank not to tell MYC its attempts at obtaining an SBA loan were futile?
 
 
 22
 MYC made two attempts to obtain an SBA loan. Cushnie testified at trial that he knew MYC was going to have problems paying back the Bank so he thought that MYC had a better chance at getting a guarantee and that the Bank never assured MYC that it would be approved for an SBA guarantee. COL# 4, 5.
 
 
 23
 MYC appears to be suggesting that the Bank should have known in October 1983, before MYC was obliged to make principal payments, that MYC was going to default on the Bank's loan in six months and therefore would never be able to get an SBA guarantee. This contention lacks merit. When the first application was denied, MYC had only missed one payment, so the Bank could not have known MYC would later default. The district court correctly found that the Bank did not make any misrepresentations to MYC regarding the SBA loans.
 
 
 24
 3. Was the Bank's refusal to assist MYC in obtaining refinancing and its refusal to accept a loan workout a breach of its duty of good faith and fair dealing?
 
 
 25
 MYC claims that the Bank negligently, possibly even fraudulently, refused to take minimal steps to help MYC refinance the loan. MYC claims that since the 3/23 contract allowed MYC to prepay the loan, the Bank had a duty not to frustrate MYC's attempts at refinancing and had a duty to take reasonable measures to assist MYC in obtaining refinancing. MYC claims that these duties are imposed as a result of the Bank's obligation to act in good faith. See 5 CMC § 1203 and Restatement (Second) of Contracts § 205, cmt. d.
 
 
 26
 MYC claims the Bank acted in bad faith on three occasions. The first instance of bad faith was the seven month delay in not telling MYC it would never qualify for an SBA guarantee. This argument is addressed above. The second instance of bad faith was the four month delay in supporting MYC's application for an EDLF loan. This claim is not supported by the evidence. COL# 10, 11. In September 1984, the EDLF informed the Bank that it needed an updated application from MYC. FOF # 24. On September 18, 1984, the Bank wrote the EDLF, supporting MYC's application and requesting MYC be given a loan guarantee. On October 15, 1984, MYC told the Bank it would prefer a direct loan rather than a guarantee. FOF # 26. On October 22, 1984, the Bank requested the EDLF to give MYC a direct loan. FOF# 26. The EDLF loan was approved on June 7, 1985. The Bank did not, in bad faith, delay MYC's application to the EDLF by taking six days to process the application. The EDLF just took a long time in making its decision.
 
 
 27
 The third alleged instance of bad faith is the Bank's refusal to accept a loan workout for sixteen months. MYC claims the Bank had a duty to refinance the loan, but it cites no authority for this proposition. COL# 6. MYC claims the Bank acted in bad faith because MYC proposed a loan workout in July 1985 and the Bank finally agreed to one in October 1986. When MYC requested the loan workout, MYC was in arrears for approximately $215,000. The Bank told MYC it expected to be repaid in full. FOF# 35. In October 1986, the Bank accepted $228,800 to retire the loan then worth over $247,000.[7] MYC claims this proves the Bank's bad faith in wanting to keep MYC paying high interest rates. However, refusing to take less than 100% of what it was owed is not an example of bad faith on the part of the Bank. COL# 7. The district court correctly concluded that the Bank did not act in bad faith.
 
 
 28
 4. Was the Bank's failure to assist MYC in obtaining refinancing a violation of the Bank Holding Company Act?
 
 
 29
 The Bank Holding Company Act is intended to prevent banks from engaging in anti-competitive behavior. "A bank shall not in any manner extend credit, ... or furnish any service, or vary the consideration for any of the foregoing, on the condition or requirement: (E) that the customer shall not obtain some other credit, ... or service from a competitor of such bank ..." 12 U.S.C. § 1972. In order to recover under § 1972(1), MYC must prove: 1) that the banking practice in question is unusual in the banking industry; 2) the existence of an anti-competitive tying arrangement; and 3) that the practice in question benefits the bank. Rae v. Union Bank, 725 F.2d 478, 480 (9th Cir.1984).
 
 
 30
 The Bank's forbearance from foreclosing on MYC's loan after the loan was in default constitutes an "extension of credit" as defined by § 1972(1). Nordic Bank PLC v. Trend Group, Ltd., 619 F.Supp. 542 (D.C.N.Y.1985). MYC claims that the Bank's unusual anti-competitive practice was its failure to help MYC get refinancing and its failure to agree to a loan workout when MYC asked for one. The Bank's breach of its "contractual duty to permit MYC to refinance the loan" is not an unusual practice because the duty, as MYC sees it, does not exist. COL# 14. The Bank was under no obligation to agree to a loan workout. COL# 6, 7. When MYC requested a loan workout, MYC only offered to pay 80% of the loan in exchange for the Bank's releasing the collateral. It is not an unusual practice for a Bank to protect its security interest. Rae, 725 F.2d at 480. In addition, the Bank did not affirmatively prevent MYC from obtaining refinancing. COL# 10, 11, 12, 13. The district court correctly concluded that the Bank did not engage in any unusual anti-competitive tying arrangements.
 
 
 31
 5. Is Cushnie entitled to damages due to the Bank's negligent infliction of emotional distress?
 
 
 32
 Cushnie claims that as a result of the Bank's outrageous conduct, he has suffered many sleepless nights and stomach upset. The district court found that these symptoms, for which Cushnie did not seek medical attention, were not cause by the Bank. FOF# 40. The Bank consequently cannot be liable on this claim, because the CNMI does not recognize a cause of action for negligent infliction of emotional distress in the absence of accompanying bodily harm. COL# 18. Arriola v. Insurance Company of North America, 2 Comm.Rptr. 113, 124 (C.T.C.1985) (stating this cause of action is not recognized by the Restatement of Torts 2d § 46 and § 436A, and declining to create such a cause of action).[8]
 
 
 33
 6. Can MYC recover punitive damages?
 
 
 34
 MYC claims that the district court should have found the Bank's conduct to be a "grossly negligent or worse" breach of its contractual duties and punitive damages should have been imposed. "Punitive damages are not recoverable for a breach of contract unless the breach is also a tort for which punitive damages are recoverable." Restatement (Second) Contracts § 355. MYC cannot recover punitive damages because the Bank did not breach its contract with MYC. In addition, the only tortious conduct MYC complains of is the breach of various duties which are not supported by the evidence or do not exist. The district court correctly concluded that MYC was not entitled to punitive damages.[9]
 
 CONCLUSION
 
 35
 For the foregoing reasons, the district court's judgment is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The district court's findings of fact and conclusions of law will be cited to as FOF and COL respectively
 
 
 [2]
 MYC alleges that it informed the Bank from the beginning that it was going to look for another loan, one with better terms, to replace the Bank's loan. However, once the Bank offered MYC a loan, MYC promptly withdrew its pending loan application. FOF# 11
 
 
 [3]
 MYC requested a 10 year loan and the Bank only offered 3 year commercial loans. MYC's income projections could not support the loan amortized over 3 years. FOF# 20
 
 
 [4]
 MYC had originally applied to the EDLF for a loan, but when the EDLF took too long processing MYC's application, MYC withdrew its application. FOF# 8
 
 
 [5]
 It appears that MYC stopped paying interest on December 7, 1983. MYC only paid $22.73 of the principal. MYC made no payments after December 7, 1983
 
 
 [6]
 MYC claims that because the district court judge adopted, "virtually verbatim," the Bank's proposed findings of fact, those findings are subject to a more careful analysis. The findings are still subject to review by the clearly erroneous standard, Anderson v. Bessemer City, 470 U.S. 564, 572 (1984), but the appellate court is to engage in a careful scrutiny to determine if the findings are supported by the record. L.K. Comstock & Co., 880 F.2d at 222. A comparison of the two versions reveals that the district court's findings of fact were not copied "virtually verbatim" from the Bank's proposed findings. In any event, a careful scrutiny of the record does reveal support for the district court's findings and conclusions
 
 
 [7]
 A $28,800 promissory note, guaranteed by Cushnie was executed as part of the settlement. This note is now in default. FOF# 38
 
 
 [8]
 Cushnie suggests that if this court finds that his injury does not meet the standard in Arriola and the restatements, this court should apply a more liberal standard to emotional distress. This court declines to change the standard
 
 
 [9]
 Our conclusion that MYC is entitled to neither compensatory nor punitive damages makes it unnecessary for us to address MYC's contention that its obligation on its $28,800 note is more than offset by the Bank's liability to MYC